## CLARK–MONTANA REALTY CO. et al. v. BUTTE & SUPERIOR COPPER CO.

(District Court, D. Montana. January 22, 1916, and May 29, 1916.)

### No. 19.

1. COURTS ⚖═367—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION.
   Where the rights of locators of mining claims, whose declaratory statements, required by state law to be recorded, were not properly verified, had become fixed and vested by patents prior to a decision of the state court that such defective verifications rendered the locations void, it was the right of the parties to have and the duty of the court to exercise its independent judgment upon the validity and effect of the declaratory statements and locations, and though, to avoid confusion, it would lean to agreement with the state court, if in its judgment the state rule of decision was unsound, it would refuse to follow it.

   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. ⚖═367.]

---

2. MINES AND MINERALS ⚙⚙21(1)—LOCATION OF CLAIMS—DECLARATORY STATE-
MENT—DEFECTS.

Under a Montana statute requiring discoverers of mining lodes or
veins to record a declaratory statement on oath, but prescribing no for-
feiture for noncompliance, a defective verification of a declaratory state-
ment did not render the location void, as discovery with intent to claim
is the principal thing, and vests an estate in the discoverer, while the
record is not necessary to create the estate, but only as notice, and to
secure to the discoverer his discovery.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 46,
47; Dec. Dig. ⚙⚙21(1).]

3. MINES AND MINERALS ⚙⚙43—LOCATION OF CLAIMS—ESTOPPEL.

Plaintiff's and defendant's predecessors in title located adjoining mining
claims conflicting to some extent; plaintiff's being the older location.
Neither party properly verified the declaratory statement, recorded as
required by the state statute. A patent was first issued for defendant's
claim, and included the conflict area. Held that, if the statute made re-
cording of the nature of conditions subsequent, the owners of defendant's
claim securing the conflict area were at most assignees of a part of plain-
tiff's claim, within the common-law rule that such conditions are to be
but substantially performed, and that no assignee of a part of the premises
to which the conditions attach can take advantage of their breach.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 125–
129; Dec. Dig. ⚙⚙43.]

4. MINES AND MINERALS ⚙⚙14(1)—LOCATION OF CLAIMS—OPERATION AND EF-
FECT OF STATE STATUTE.

Under the federal statute, authorizing local rules governing the loca-
tion of mining claims and the manner of recording, state statutes govern-
ing these matters are of no more force and effect than miners'. rules.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 18;
Dec. Dig. ⚙⚙14(1).]

5. MINES AND MINERALS ⚙⚙44—PATENTS—CONCLUSIVENESS.

A patent for a mining location, covering a conflict with another loca-
tion, which conflict was excluded when a patent was subsequently issued
for the other location, was not conclusive that the location first patented
was the older, as the land department does not determine nor try priori-
ties, and has no jurisdiction to do so· farther than that entry made and
patent issued is an implied, if not an express, conclusive determination
that the patentee has priority to the surface area.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §
130; Dec. Dig. ⚙⚙44.]

6. MINES AND MINERALS ⚙⚙39—PATENTS—ADVERSE CLAIMS.

Though an applicant for a patent for a mining location conflicting with
another location is a subsequent locator, the law requires the issuance of
the patent to the applicant, unless the prior locator files an adverse claim
and litigates it in the proper court.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 114;
Dec. Dig. ⚙⚙39.]

7. MINES AND MINERALS ⚙⚙41—PATENTS—ADVERSE CLAIMS.

A prior locator of a mining claim can abandon and refuse to litigate
a conflict area claimed by a subsequent locator in applying for a patent,
without creating a presumption to his prejudice in respect to the re-
mainder of his claim, whether he abandons the conflict because of fear
or favor or pure indifference.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§
116–119; Dec. Dig. ⚙⚙41.]

⚙⚙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. MINES AND MINERALS ⬤➡43—LOCATION—DEFECTIVE COMPLIANCE WITH LOCAL RULES.

In so far as there is no conflict if the government does not avoid a mining location for defective compliance with local rules, but issues a patent, the patent vests all the extralateral rights appropriate to the veins within the surface as of the date of discovery, of which no third party can complain.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 125–129; Dec. Dig. ⬤➡43.]

9. MINES AND MINERALS ⬤➡38(16)—SUITS TO QUIET TITLE—ADMISSIONS.

Where, in a suit to quiet title to minerals, defendant admitted that an exhibit to the complaint was the declaratory statement for plaintiff's location, that none other was recorded, and that the patent proceedings were based thereon, it of necessity admitted that the patent for plaintiff's claim issued upon such statement.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 102½; Dec. Dig. ⬤➡38(16).]

10. MINES AND MINERALS ⬤➡38(14)—SUITS TO QUIET TITLE—BURDEN OF PROOF.

In a suit between the owners of adjoining mining claims, in which each sought to quiet title to minerals, it was admitted by defendant that the apex of the R. vein crossed the common side line of the two claims, that from its apex in plaintiff's claim it extended on its dip under defendant's claim, and that the body of ore in dispute under both claims and in places bisected on the strike by the common side line was in such vein. *Held*, that this admission overcame the common-law presumption that defendant owned that part of the ore under its own claim, and imposed upon it the burden of proving by a preponderance of the evidence that its claim was the older location, and that the J. vein, having its apex in its claim, united with the R. vein above a part of the ore claimed by it.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 101; Dec. Dig. ⬤➡38(14).]

11. MINES AND MINERALS ⬤➡38(15)—SUITS TO QUIET TITLE—BURDEN OF PROOF.

Such burden, resting on defendant, could not be sustained by leaving the issue in doubt or balance.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 102; Dec. Dig. ⬤➡38(15).]

12. EQUITY ⬤➡172—PLEADING—CONFESSION AND AVOIDANCE—CONFESSION AS ADMISSION.

In equity, as at law, if a fact is admitted and another fact is averred to avoid it, the fact admitted is proved, with all its consequences, and stands as though the fact in avoidance had not been averred, unless it also is proved.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 408; Dec. Dig. ⬤➡172.]

13. EVIDENCE ⬤➡265(7)—ADMISSIONS—JUDICIAL ADMISSIONS.

A fact admitted at the trial is proved, as though admitted in the answer on oath.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1035; Dec. Dig. ⬤➡265(7).]

14. MINES AND MINERALS ⬤➡38(18)—SUITS TO QUIET TITLE—BURDEN OF PROOF.

In a suit to quiet title to ore, defendant admitted that the apex of the R. vein crossed the common side line of plaintiff's and defendant's claim, that from its apex in plaintiff's claim it extended on its dip under defendant's claim, and that the ore body in dispute was in such vein, but claimed that the R. vein united on strike and dip with the J. vein, while plaintiff claimed that the J. vein on strike and dip crossed the R. vein.

*Held*, that plaintiff was not required to prove that the two veins crossed, but only to offset defendant's evidence that they united, and, if the alleged union was in doubt or balance, the finding must be that they did not unite, though the evidence would not warrant a finding that they crossed.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 104; Dec. Dig. ☞38(18).]

15. MINES AND MINERALS ☞38(18)—QUIETING TITLE—SUFFICIENCY OF EVIDENCE.

In a suit to quiet title to ore in a vein the apex of which crossed the common side line of plaintiff's and defendant's mining claims, and which from its apex in plaintiff's claim extended on its dip under defendant's claim, evidence *held* insufficient to show that such vein united on strike and dip with a vein having its apex in defendant's claim, as asserted by defendant.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 104; Dec. Dig. ☞38(18).]

16. MINES AND MINERALS ☞38(18)—QUIETING TITLE—ADMISSIONS AND CONCESSIONS.

Where, in a suit to quiet title to ore, defendant alleged that two veins united, and claimed an estate by reason of such union, while plaintiff denied that they united, and alleged that they crossed, and admitted a different estate in defendant by reason of the crossing, defendant, though it failed to prove the union, was entitled to the estate that plaintiff admitted or conceded to it.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 104; Dec. Dig. ☞38(18).]

17. MINES AND MINERALS ☞31(1)—EXTRALATERAL RIGHTS—END LINES.

There can be but one set of end lines for a mining claim, and if the located end lines fixed extralateral rights upon one vein, they fixed them upon all veins.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 75; Dec. Dig. ☞31(1).]

18. MINES AND MINERALS ☞38(18)—QUIETING TITLE—SUFFICIENCY OF EVIDENCE.

In a suit to quiet title to ore, evidence *held* insufficient to show that a strand of a vein crossed the east end line of defendant's claim.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 104; Dec. Dig. ☞38(18).]

19. MINES AND MINERALS ☞54(2)—CONVEYANCES—EXTRALATERAL RIGHTS—"IN."

Plaintiff owned a mining claim containing the apex of a vein passing on its dip under the B. claim, adjoining it on the north, and also owned an undivided one-fourth interest in the B. claim. It executed an option to purchase all of its right, title, and interest in and to the B. claim, and pursuant to a resolution of its directors executed a deed conveying all of its title and interest in and to such claim, together with all dips, etc., and all metals therein, and all rights and privileges incident and appurtenant thereto. *Held*, that this merely conveyed the B. claim and its extralateral rights, and gave the grantee no title to the dip of veins apexing in plaintiff's claim and extending under the B. claim, or to such portions of veins apexing in the B. claim as dipped under plaintiff's claim, if the facts as to location and patent made the extralateral rights of plaintiff's claim and not those of the B. claim attach thereto, as veins to which plaintiff's extralateral rights applied were not "in" the B. claim, though they dipped under its surface.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 150; Dec. Dig. ☞54(2).

For other definitions, see Words and Phrases, First and Second Series, In.]

20. MINES AND MINERALS ⊝⇒51(2)—ACTION FOR ACCOUNTING.

In a suit between the owners of adjoining claims, each party alleged ownership of ores, unfounded adverse claims beclouding title, underground trespasses and removal of ores, that the amount and value could be ascertained only by discovery and accounting, and that the adverse party threatened to, and would, unless restrained, remove and convert the ores, inflicting irreparable damage. Each prayed that its title be quieted, that the assertion of adverse claims and further entry and removal of ores be enjoined, that the adverse party be required to account, and that decree for the value of the ores wrongfully taken be rendered. *Held*, that the suit was not for damages, but for an accounting, and plaintiff, having elected its remedy, could not, because of a rise in the value of zinc, claim damages as for conversion.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 138; Dec. Dig. ⊝⇒51(2).]

21. MINES AND MINERALS ⊝⇒51(2)—CONVERSION—ACTS CONSTITUTING—REMEDY.

Where ore, the title to which was in dispute, was mined by the owners of adjoining mining claims under an agreement that, when the ownership was determined to the satisfaction of both, an accounting and settlement would be had, the taking was not conversion, but sounded in contract, and the only remedy was to compel the promised accounting.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 138; Dec. Dig. ⊝⇒51(2).]

22. PLEADING ⊝⇒36(2)—ADMISSIONS—CONCLUSIVENESS.

In a suit to quiet title to ore, and for an accounting for ore mined by defendant and claimed by plaintiff, plaintiff admitted that ores taken by defendant from beneath its own mining claim, but from a vein having its apex in plaintiff's adjoining claim, were taken by defendant in the honest belief that it owned them. Ores taken by defendant from beneath plaintiff's claim were known to be in the same vein, and it was known that the same portion of the apex would control the ownership of all of the ores. *Held*, that plaintiff was precluded by his admission from contending that defendant did not honestly believe it owned the ores taken from beneath plaintiff's claim.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 81; Dec. Dig. ⊝⇒36(2).]

23. MINES AND MINERALS ⊝⇒51(5)—ACCOUNTING—DAMAGES.

In accounting in equity for portions of realty severed and appropriated under the honest belief of ownership, no other injury appearing, the award to the owner is the value in place, which, in the case of ores, is reached by deducting from the amount that ought reasonably to have been received by the appropriator, the reasonable cost of mining, marketing, or reducing to money, or the actual cost, if less than the reasonable cost.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 141; Dec. Dig. ⊝⇒51(5).]

24. MINES AND MINERALS ⊝⇒51(5)—ACCOUNTING—DAMAGES.

In such case, no freight to mill could be allowed beyond what it would have cost plaintiff to transport the ores to its own mill.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 141; Dec. Dig. ⊝⇒51(5).]

25. MINES AND MINERALS ⊝⇒51(5)—ACCOUNTING—DAMAGES.

In such case, defendant could not be charged with the value of mill tailings, which would have had a value at the time of the accounting, had they been saved, where at the time the ores were taken no buyer in the then experimental state of science would have taken them into account in fixing a purchase price.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 141; Dec. Dig. ⊝⇒51(5).]

⊝⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**26. MINES AND MINERALS** ☞38(25)—QUIETING TITLE—DECREE.

In a suit between the owners of adjoining mining claims, a decree that each party was entitled to so much of certain veins as lay within the determined end line planes projected where the apices crossed the common side line *held* sufficiently definite, without fixing the point where certain veins and strands crossed the common side line.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 111; Dec. Dig. ☞38(25).]

In Equity. Suit by the Clark-Montana Realty Company and others against the Butte & Superior Copper Company. Decree as stated in opinion.

The following is a general sketch of the claims involved:

1. Pyle at Elevation Blackrock 1100.
2. Creden at Orlu 1100.
3.    "     "     "    1200.
4. Copper "     "    800.
5.    "     "     " 1400.
6. Jersey Blue, as claimed by plaintiff.
7. Deadwood, near surface.
8. Unnamed "Blue" vein.
   Rainbow and Jersey Blue at Surface.

John P. Gray, of Cœur d'Alene, Idaho, M. A. Folsom, of Spokane, Wash., and W. A. Clark, Jr., J. L. Templeman, and Geo. F. Shelton, all of Butte, Mont., for plaintiffs.

W. H. Dickson and A. C. Ellis, Jr., both of Salt Lake City, Utah, and Kremer, Sanders & Kremer, of Butte, Mont., for defendant.

BOURQUIN, District Judge. An apex controversy, both parties seeking to quiet title and damages. The premises are in the Butte district. The Realty Company called plaintiff, owns the Elm Orlu claim, and defendant owns the Blackrock and other claims. Only the two named need be referred to, save in the decree. They have a common side line for 850 feet of the Elm Orlu east end and of the Blackrock west end.

It is now admitted that the Rainbow vein at the apex crosses the Elm Orlu west end line, courses easterly, crosses the common side line and branches in the Blackrock, one strand crossing the Blackrock north side line, and one coursing easterly a disputed distance;

that the Pyle strand of the Rainbow at some depth in the Elm Orlu diverges from the south side of the said vein and, coursing easterly, unites with the Rainbow at the Blackrock 1,100 level; that the Jersey Blue vein at the apex crosses the Blackrock west end line and courses easterly a disputed distance, it and the Rainbow converging on strike and dip to union or crossing; that the Creden vein at some depth in the Elm Orlu near the Blackrock west end diverges from the north side of the Rainbow, courses northwesterly under both claims, and unites with or is cut off by the Jersey Blue. Very large ore bodies are in the Rainbow under both claims, at places bisected on strike by the common side line, and both parties have mined them under both claims. From various names of the veins those herein are chosen to avoid confusion. The issues remaining are as follows:

Plaintiff alleges that the Elm Orlu is the older location, and defendant alleges the Blackrock is. Plaintiff alleges that the apex of the Pyle strand is in the Elm Orlu and crosses the Elm Orlu east end line, and that the vein on strike and dip unites with the Rainbow vein; and defendant denies all thereof at points east of the Rainbow apex crossing of the common side line that would give extralateral rights to plaintiff. Defendant alleges that the Rainbow and Jersey Blue unite on strike and dip, and plaintiff denies it and alleges that on strike and dip the latter crosses the Rainbow. Defendant alleges the easterly strand of the Rainbow crosses the Blackrock east end line, and plaintiff denies it. Defendant asserts some ownership of ore bodies under both claims by virtue of estoppel by deed executed by plaintiff to defendant's predecessor in interest, and plaintiff denies estoppel. Both parties allege and deny trespass and damages, and accounting is deferred. Appropriate legal consequences and rights are asserted by both parties. The trial consumed 16 days. There are nearly 1,600 pages of testimony, and 130 exhibits. Maps and models are duplicated, save in more or less theoretical geology, from which unwarranted impressions are to be avoided. The testimony is of five experts for each party, all men of eminence in geology, or mining engineering, or both. For plaintiffs are Greene, of Butte, Irving, of Yale, Weed, of New York, Searls, of Nevada, and Winchell, of Minneapolis. For defendant are Finch, of Denver, Emmons, of Minnesota, Salisbury, of Chicago, and Burch and Wiley, of California. There is some conflict of facts and more of argument, opinions, and conclusions. Most of it can be imputed to the complex geological and other problems, conditions underground, difficulties of observation, and honest differences of interpretation by reasonable and learned men. But in instances partisanship apparently impaired judgment. As a whole, however, the testimony inspires confidence and deserves careful consideration. The judge gave two days to inspection of the premises, but since some places in evidence had been stoped and others obscured by fallen ground or timbering, with intermittent crevices and small openings through which to peer and distinguish granite, altered and otherwise, slips, faults, gouges, aplite, quartz seams, and veins, he has not been greatly aided to determine what evidence is more credible and weighty. The complexities which learned doctors studied for weeks, months, or

years (which to solve at a minor point one of defendant's witnesses said was beyond him, in that it would take a year's study), and now disagree upon, are not much clearer now than before that hurried passage through many workings.

In the matter of priority of location, plaintiff attached to the complaint as exhibits a copy of the declaratory statement of each claim, alleged the locations, that based thereon patent had issued upon each claim, and defendant by answer in effect admits all thereof. Plaintiff offered in evidence the patent proceedings, and introduced oral testimony of the Elm Orlu location, to all of which defendant objected that both locations were invalid when made, and neither could be established, save as of date of patent entry. Defendant's patent entry is the older, and on it defendant relies as the date of the Blackrock location. The Elm Orlu declaratory statement recites location of the "lode" in April, 1875, and it was recorded a few days later, and that of the Blackrock recites location of the "claim" in November, 1875, and it was recorded a few days later. At that time a Montana statute provided that all discoverers of lodes or veins "shall" record a declaratory statement thereof "on oath," but prescribed no forfeiture for noncompliance. The oral testimony sufficiently proves that at least in 1875, and shortly after the Blackrock location, its owners knew the Elm Orlu was then claimed; that at least in 1876 a vein had been discovered in the Elm Orlu and the corners staked; and that thereafter annual labor was continuously performed, the claim leased, and ore mined; and it was well known and to the knowledge of the owners of the Blackrock thenceforward. In November, 1880, the Blackrock owners applied for patent based on the aforesaid declaratory statement, no adverse claim was filed, entry was made, and patent issued in February, 1882. In December, 1882, the Elm Orlu owners applied for patent based on its aforesaid declaratory statement. The proceedings showed and excluded a conflict area with the Blackrock, and theretofore included in the Blackrock patent. Entry was made and patent issued in January, 1884.

[1] The verifications to said declaratory statements were defective, in that in substance each of them merely recited that the locators were citizens and that the instrument was a copy of the original notice of location posted on the claim. In 1885 the Montana territorial Supreme Court first held that for like defective verification the declaratory statement was void. Later this was expanded to hold the location also was void. See Hickey v. Mining Co., 33 Mont. 46, 81 Pac. 810. And that continued the rule of decision until 1907, when it was modified by statute, providing that the record of the certificate of location is for constructive notice, that a certified copy thereof is prima facie evidence of all facts properly recited in the certificate of location, and that no defect is material save in favor of subsequent locators "in good faith and without notice." Laws Mont. 1907, c. 16, § 11. All rights to the premises involved had become fixed and vested by patents prior to the said rule of decision. Hence it is the right of the parties to have and the duty of the court to exercise its independent judgment upon the validity and effect of the declaratory statements and

locations; and though for comity and to avoid confusion the court leans to agreement with the state tribunal, if in its judgment the state rule of decision is unsound, it must refuse to follow it. See Kuhn v. Coal Co., 215 U. S. 353, 30 Sup. Ct. 140, 54 L. Ed. 228.

[2] A location and its record are different things. The federal and most state statutes distinguish between them, the former even in authorizing local rules "governing the location" and "manner of recording." Comp. St. 1913, § 4620. The statutory object is to protect and reward discoverers of mines. Discovery with intent to claim is the principal thing and vests an estate—an immediate fixed right of present and exclusive enjoyment in the discoverer. The record is incidental machinery to secure to the discoverer his reward and to give notice to others. The spirit of all recordation acts is notice to protect others against secret equities. If the record is not necessary to create the estate (as it is in the matter of homestead exemptions and mechanics' liens), the statute providing for recording is but a direction to do certain acts and does not create conditions subsequent; and if the statute provides no forfeiture for failure to record, by failure the estate is not divested. Recordation of mining locations cannot be a condition precedent, for the estate arises before recordation is to be performed.

[3] If the Montana statute made recording of the nature of conditions subsequent (of feudal origin), at common law such conditions are to be but substantially performed. And no assignee of *part* of the premises to which the conditions attach can take advantage of their breach; and the owners of the Blackrock, securing the conflict area, were at most assignees of but part of the Elm Orlu premises. The United States forfeited neither claim for defective verification—if a breach of condition subsequent. The estate in neither, if voidable, was avoided. Both were confirmed and patented. Where Congress intended forfeiture of mining and other public lands claims for breach of conditions subsequent, it plainly said so. Vide forfeiture for failure to perform or contribute to annual labor. Recording acts that expressly provide forfeiture for failure to comply with them do so in favor of only subsequent bona fide claimants. Forfeitures are odious and not to be implied. Prior to patent entry of these claims, a Montana statute provided that all ambiguous statutes should be construed "in favor of natural right," and it would not have been too far-fetched to apply it to the statute directing recordation of mining claims. In 1875 Montana was indeed primitive. Those learned in the law were few. It is doubtful if there was a lawyer in Butte. The prospectors, pioneers and founders of this wonderful West, seeking in good faith to comply with the recordation law, for mere technical failures therein should not have been subjected to so harsh a construction of that statute and deprived, as many of them were, of their discoveries. And deprived for whom? Subsequent bona fide discoverers and locators? No; as a rule for those unspeakable creatures who search public records to discover and take advantage of defects in their neighbors' titles.

[4] These statutes are of no more force and effect than miners' rules. Both are authorized by the one federal statute. The better, if

not prevailing, rule always has been that, if the recordation law does not expressly provide forfeiture for failure to record, the location is valid though not recorded. That is the rule of this Circuit. Last Chance Mining Co. v. Bunker Hill Mining Co., 131 Fed. 586, 66 C. C. A. 299. In Yosemite Mining Co. v. Emerson, 208 U. S. 30, 28 Sup. Ct. 196, 52 L. Ed. 374, the Supreme Court held that one with knowledge of the existence of a mining location could not take advantage of the locator's failure to post two notices required by local rule, he having posted but one, the rule not providing for forfeiture, in that he had all the information the notice was designed to give, and that to hold that the failure to post the second notice "would work a forfeiture would be to permit the rule to work injustice and to subvert the very purpose for which it was enacted."

True, the posted notice is temporary, and the recorded one permanent. But the principle is the same, viz., that the failure to comply with local rules or statutes that do not prescribe forfeiture as a consequence is immaterial so far as those with knowledge of the locations are concerned. If one such statutory requirement does not imply forfeiture for failure, why should another? If in the case cited partial failure was not fatal, why should it be in the case at bar? No reason appears why the rule of the Yosemite Case does not control this at bar. The state rule of decision, now set aside by statute, does not commend itself as sound, and cannot be followed here.

[5-9] From the declaratory statements it appears the Elm Orlu is the older location; and if we reject both statements, by oral testimony the same fact appears. In the matter of the plaintiff's contention that the Elm Orlu is the older for the additional reason that it was exclusively possessed and worked for the local period of limitations for the recovery of real property, prior to the Blackrock patent entry, and secured thereby the equivalent of a valid location, the evidence is not sufficiently clear and definite to prove it. And in the matter of defendant's contention that in any event the Blackrock is the older by reason of a conclusive presumption created by the patent for the conflict area, citing the Stemwinder Case, it suffices to say that it seems that the cited case is superseded by the Lawson Case, 207 U. S. 1, 28 Sup. Ct. 15, 52 L. Ed. 65. The principle of the Lawson Case is that, if to a patent application there is not filed and in court tried and determined an adverse claim, the patent proceedings decide nothing, save that the applicant is entitled to a patent for the surface area applied for. That is the decision, though the court proceeded to fortify it by elaboration that might confuse. The land department does not determine nor try priorities. It has no jurisdiction to do so, farther than that entry made and patent issued is by it an implied, if not express, conclusive determination that to the surface area entered and patented the patentee has priority. Although the applicant is a subsequent locator, if the prior locator does not file an adverse claim and litigate it in the proper court, the law directs that patent shall issue to the applicant. A protest filed in the land office by the prior locator would be ignored. Public policy forbids that a prior locator cannot abandon and refuse to litigate the conflict area claimed by a subse-

quent locator without creating a presumption to his prejudice in respect to the remainder of his claim. Whether he abandons the con-flict because of fear or favor or pure indifference is immaterial. And not claimed, or if abandoned, there is no conflict, even though the location lines overlap. Locations are of surface, including veins. In so far as there is no conflict, if the United States do not avoid a location for defective compliance with local rules, and issue patent, the patent vests all the extralateral rights appropriate to the veins within that surface and as of date of discovery, of which no third party can complain. Defendant, admitting that the exhibit to the .complaint is the Elm Orlu declaratory statement, that none other was recorded, and that all Elm Orlu patent proceedings were based thereon, of necessity in substance admits the Elm Orlu patent issued upon said declaratory statement, and invokes the principle of the Lawson Case against itself. And the facts were also proven—as potent as stipulation or other ad-missions.

The court finds that the northerly wall of the Rainbow apex crosses the common side line 190 feet from the southwest corner of the Black-rock, and that the southerly wall so crosses 301 feet from said corner. For plaintiff the testimony is that the latter crossing is "about" 308 —"rather the extreme and indefinite limit of the mineralization which accompanies the vein"—to 314 feet; for defendant, "about" 300 to 301 feet. All agree there is no defined wall—that it is indefinite and leaves much to judgment. Considering the evidence in light of inspection and that the burden of proof is upon plaintiff, it is believed that the concession of defendant is more nearly right and as favorable to plaintiff as the facts warrant. The exposure is in a surface trench, and it is difficult to distinguish vein matter in place from mere seepage effect in adjacent country, whether of vein solutions or surface waters, and perhaps mushrooming beyond the limits of the vein proper below. A shaft might have contributed to accuracy. Finch testified that with-in the limits of the 300 feet he included 15 feet to the extreme limit of rock alteration, with a few little seams in it "to be consistent with the interpretation of a vein at other points." This is admirable frank-ness, but imports that at vital points and to indefinite extent he char-acterized that as vein which in his judgment is not vein, to serve his client and avoid hazard of comparison. The difficulty is that, when an expert shades his testimony upon the principle of do ut des, partisan-ship is likely, if not certain, to favor his client, and the court cannot determine to what extent, inevitably detracting from the weight of his opinion.

Adverting to the Pyle strand, it is known to diverge from the south side of the Rainbow at and above the Elm Orlu 1,200 level, and cours-ing easterly and at points 100 feet south of the Rainbow it crosses the common side line at the elevation of the Blackrock 1,100 level, 250 feet west of the Elm Orlu northeast corner, and unites on strike and dip with the Rainbow in the Blackrock at said level, 230 feet east of said crossing and 60 feet north of said corner. At this union it is a strong vein, 15 feet wide. One hundred feet west of the union there is a raise upon the Pyle, which, offsetting west, ends 40 feet above the

Elm Orlu 500 level. In this raise the Pyle dips vertical to the Black-rock 800 level, then north 75 degrees to the union. The Pyle dwindles in width going upward. It is known in the raise to 40 feet below the Elm Orlu 500, and there it may be cut off by a southerly dipping gouge slip, or this latter may be the Pyle fissure extending upward; the mineralization there having ceased temporarily or permanently. If this gouge slip continues to surface and with the dip it has in the raise, it would roughly approximate the Rainbow dip and apex in the Blackrock. In some zigzag workings from the raise in the Elm Orlu 500 the Pyle appears, if at all, in small, irregular, dislocated quartz seams and gouge. This is the greatest elevation at which the Pyle has been identified throughout a block from the raise to the Elm Orlu east end line, 150 feet; to the Rainbow west, 475 feet; to the Elm Orlu north side line, 50 to 150 feet; and to surface, 380 to 410 feet. The Pyle has the characteristic branching of the Rainbow. East of the raise and on the various Blackrock levels below the Elm Orlu 500 the Pyle or its branches have been developed easterly. At the Black-rock 800 level an erratic, branching strand has been followed easterly, and one branch of a few inches in width crosses the Elm Orlu east end line. At its western end the Pyle has been developed at its union with the Rainbow on various Elm Orlu levels below and perhaps to the 500.

Three hundred and fifty feet above the raise the country has been thoroughly crosscut by the Clark tunnel and connected workings, in which are slips, seams, and more than 15 small veins, some in each claim, some of those in one claim as reasonably to be correlated with the Pyle as those in the other. These premises are filled with slips, gouges, seams, veinlets, and veins, and will not permit correlation nor projection of small features like the Pyle at the Elm Orlu 500, save for slight distances. Plaintiff's witnesses are in doubt whether the Pyle ends in the raise or continues to the surface. Defendant's witnesses incline to the opinion it continues upward; that the southerly dipping slip in the raise is the Pyle fissure and should apex in the Blackrock. This slip, if the Pyle fissure, may contain ore above though mineraliza-tion ceased in the raise, and have its apex in some indefinite place above. Where is the apex of that part of the Pyle at the union on the Blackrock, 1,100 level is conjecture. Even if that "sliver" of the Pyle crossing the Elm Orlu east end line at the 800 level could serve as a vein to confer extralateral rights, where is its apex, and whether on dip it unites with the Rainbow, are also conjecture. And to what ex-tent, if at all, the Pyle from its western divergence from the Rainbow unites with the latter on dip is not apparent. At the west it may be a part of the considerable ore body in which is the Bruce raise, and may go down vertically indefinitely, or end in lenticular form, or feather out and not unite on dip with the Rainbow. The patent presumption that the apex of a vein in the Elm Orlu, discovered before entry, ex-tends across the east end line, cannot attach to the Pyle; and all that is proven is that the Pyle is known at its western divergence from the Rainbow and at other points, making it clear that at the points of divergence and for some undefinable distance easterly its apex is in the Elm Orlu.

[10-14] Whether the Jersey Blue unites with the Rainbow is the most contested issue. In view of the finding that the Elm Orlu is the older location, each party contends against its own interest. During the trial and argument for defendant, it was admitted that the Rainbow apex crosses the Elm Orlu west end line and the common side line; that from its apex in the Elm Orlu on its dip it extends under the Blackrock; that the great ore body in dispute west of the apex cross-ing at the common side line, under both claims and in places bisected on strike by said side line, is in said vein; and that it extends down-ward to the uttermost depths. These facts are conclusively proven as well. This admission overcomes the common-law presumption that defendant owns that part of that ore body under the Blackrock west of the apex crossing, and imposes upon defendant the burden of prov-ing by a preponderance of the evidence (1) that the Blackrock is the older location; (2) that the Jersey Blue unites with the Rainbow above any part of that ore body by defendant claimed. The whole is a single ore body under both claims, the apex of the whole being in the Elm Orlu. To avoid the otherwise inevitable legal consequences, the de-fendant must prove the union of veins, even as it must prove the estoppel by deed it alleges. And this burden cannot be sustained by leaving the issue in doubt or balance. This is clear in respect to (1) that part of the ore body above the alleged union and under both claims; (2) that part of it below the union and under the Elm Orlu. And so is it in respect to that part of the same ore body below the union and under the Blackrock. Defendant confesses and avoids. In equity, as at law, if a fact is admitted and another fact is averred to avoid it, the fact admitted is proven with all its consequences, and stands as though the fact in avoidance had not been averred, unless the latter also is proven. See Clements v. Nicholson, 6 Wall. 315, 18 L. Ed. 786. Of course, a fact admitted at trial is proven even as though admitted in answer on oath. Otherwise, perjury in plead-ings would be encouraged. And the plaintiff is required to only offset defendant's evidence that the veins unite. It is not required to prove they cross. The question or issue is, Do they unite? and evidence that they cross is only in support of the denial that they unite. Hence, if upon all the evidence the alleged union is in doubt or balance—in doubt or balance whether they unite or cross—the finding must be that they do not unite even though the evidence would not warrant a find-ing that they cross. Any extended review of the evidence is im-practicable, but a general survey of it will aid in determining the issue.

[15] The premises are in granite country. The Rainbow is of an east and west vein system of the first fissuring resulting in veins in the district. When these veins were well mineralized, there occurred a northwest system of fissures crossing the east-west veins, often very obscurely (and which were also mineralized in the latter age of east-west vein mineralization, but to a less degree), designated as "Blue" veins. Of the "Blue" veins at least three are in these premises—the Deadwood, which crosses and faults the Rainbow near the Blackrock discovery shaft; the Copper, which to some extent also crosses and faults the Rainbow, is itself irregular and dislocated by faults, and is

in the southwest part of the Elm Orlu; and a nameless one, of which little is known, near the center of the Elm Orlu.

Plaintiff classifies the Jersey Blue as a "Blue" vein, and defendant denies it, contending it is a strand of the Rainbow and an east-west vein. The Rainbow is one of the greatest veins in the district. It was early and extensively mined for some 2 miles in length and in places to 1,500 feet in depth. In general, it is a broad zone of multiple and complex shattering, wherein largely by replacement mineralization occurred—at some places, in a wide, continuous vein; at others, in several roughly parallel strands, which may unite on strike or dip, or both; at others, in detached lenticular bodies; at others, in spurs or strands diverging from the main portion on strike, dip, or rise, and either feathering out or ending in lenticular form. At places in these premises it is 200 or more feet in width and largely commercial ore, while at others it narrows to a few feet, if not to a mere fissure, so far as ore is concerned. It has been greatly disturbed and faulted, not only by the "Blue" veins and other northwest fractures, but also by a later great series of multiple postmineral fractures designated the Blackrock fault. In these premises, the general course of this fault is that of the Rainbow. It is sometimes in four or more strands, sometimes parallel in and along the Rainbow, branching and uniting—sometimes in the vein or along and now the old wall of the vein or itself defining the line of least resistance at the limits of mineralization, and now itself the wall of the vein; perhaps sometimes a strand in the Jersey Blue, sometimes diverging into the country. The direction and extent of movement along it is vague. The several segments of country and vein between its strands all may have diversely moved. Most of the witnesses appear to believe the south side moved west at least, though Emmons testifies that to seek the segment of the Jersey Blue vein on the south side of the Rainbow and the Blackrock fault, if it crosses them, you could look for 200 feet either way from the Jersey Blue vein on the north side. The Rainbow apex in the Elm Orlu is from 50 to 100 feet wide. It dips steeply south to the Elm Orlu 800 level, then flatly north 55 degrees. It is probable that the Rainbow or a strand of it also descends vertically, having branched near or below where it dips flatly north. As it descends it widens. Where from the west it approaches and crosses the common side line it may be 200 feet wide, largely of commercial ore; and of these magnificent dimensions it courses easterly practically throughout the Blackrock. The Jersey Blue at the Blackrock west end line is 250 feet from the Rainbow. It courses more easterly than the latter and is of a dip more steeply maintained, so that from surface somewhere 300 feet east of the Rainbow apex crossing of the common side line to beyond the Blackrock west end line, and there 1,300 to 1,600 feet below the surface, the two veins have converged to union or nonunion, if not crossing.

The Jersey Blue is relatively regular and narrow, 2 to 30 feet in width. It is little mineralized, especially in the upper levels, having less than 1 per cent. stoping ground; the Rainbow having 40 to 50 per cent. Even at the point where it does or does not unite with the Rain-

bow it is relatively small, sometimes about 2 feet in width and poorly mineralized, in striking contrast to the great ore body at that point and above and below it in the Rainbow. So little is the worth of the Jersey Blue that in argument it is characterized by defendant's counsel as "not worth six pence, * * * the insignificant Jersey Blue vein which don't amount to a hill of beans anyway." And this is so for 1,000 feet of length that is known and to 1,300 feet in depth. As these veins converge the country between them is somewhat fractured and mineralized, at places having some commercial value.

Defendant's witnesses describe this as more or less conjugated fracturing, but forming a "horse-tail" structure uniting the two veins, though Emmons testified it did not make them one vein, but is an ore body between the veins. Finch imputes it to tension fracturing; Emmons to that of compression. It is apparent that they include in this "horse-tail" structure much that is internal transverse structure of the Rainbow and south of the Rainbow's well-defined hanging wall. Defendant's maps show it, and it is clear from the testimony of Finch and Emmons. When they admit that the Rainbow hanging wall is in the raise from the Blackrock 1,300 level (and it is also conclusively proven), they admit the Rainbow hanging wall both ways from the raise and north of the "horse-tail" structure. Finch testified that south of said hanging wall the Rainbow structure parallels the wall, and south of that is the "horse-tail" structure transverse the Rainbow, pointing to the Elm Orlu 1,300 level stopes. They also testified that this "horse-tail" structure diverges from the south side of the Jersey Blue and extends to the north hanging wall of the Rainbow, pointing it out on defendant's maps, where it is so painted but—in wholly undeveloped country.

This mineralization outside of and between the veins is of little extent and consequence. It doubtless at some places extends from vein to vein and some thereof in transverse fissures. But little of it is of commercial value and it by no means merges the veins. Both, as Emmons testified, retain their identity by reason of a "pretty definite limiting zone outside the two master fractures" of the two veins. It is not near as extensive as painted by defendant; otherwise, and if Finch's theory is correct (all the fissuring here is steep and seems normal—of tension), it ought to also appear where it does not, north of the veins at depth where the north country is the hanging wall side. The fracturing may be there, but not the mineralized "horse-tail" structure; and it is fair to infer that the mineralization between the veins came in connection with the great mineralization of the Rainbow and little from the barren Jersey Blue. These two veins have points of resemblance, but more of difference. The Jersey Blue more approximates to the "Blue" veins than to the Rainbow. Defendant's witnesses are of the opinion the Rainbow and Jersey Blue are of the same age and unite, the latter a strand of the former. Plaintiff's witnesses are of contrary opinion. The latter definitely describe places where the Jersey Blue crosses the Rainbow, from observation. But it is difficult to determine whether the testimony of defendant's witnesses that the veins unite is theory, inferences from or reflection of

233 F.—36

defendant's maps, or actual underground observation. Close scrutiny of the testimony discloses that none of defendant's witnesses testified that he actually saw in the ground a union or merger of the veins, save Finch, who by reason of special observation was evidently put forward for the specific purpose; and in every instance, and they are but three or four that Finch testified to a "definite junction" of the veins or where "seen to unite," he not only did not describe the manner of the union, save in one instance, that it was not along gouge, but in a "mass of ore," but he placed it in undeveloped territory or in the "horse-tail" structure and north of the Rainbow hanging wall; and he so pointed it out and measured distances on defendant's maps. Converging strike and dip are no more persuasive of union than of crossing of veins. In these premises veins are shown to cross as often if not oftener than they unite. It is a circumstance to be noted that in testimony and argument it is insisted in defendant's behalf that its maps are evidence, intended to speak for themselves and to illustrate faults, ore, and ore structure in the veins. This may be allowed in so far as they conform to proven facts or are not self-serving. And looking to these maps, they show the Jersey Blue ore structure at an angle to, and not merging in, the Rainbow structure, and abutting against faults or gouge, and not against Rainbow ore. But this is largely theory.

It is surprising in view of what is involved, that so little development has been done at the points of first contact between these veins, and where union or nonunion or crossing ought to be more open to determination than elsewhere. It is realized development is expensive. The ground is heavy and difficult to hold. Each party did some development work for the other. Their workings unite at many points. But in instances both parties halted development at seeming vital points, as though fearful of results damaging to their theories. To briefly review this development, it is largely post-litigation. In all the years subsequent to location of the Blackrock and until this litigation threatened, no workings from the discovery shaft were on the Jersey Blue. This shaft is in the easterly Rainbow strand about 100 feet from where the Rainbow branches. But on the tunnel level, 50 feet below the surface and 400 feet west of the discovery shaft, was the face of a drift on the Jersey Blue, and on the 400 level was a drift through the country for 1,200 feet west of the shaft, from which three or four crosscuts were run to the Jersey Blue. After this litigation threatened, defendant ran two parallel drifts, with crosscuts, from the drift face aforesaid, easterly to the discovery shaft. For the first 100 feet one drift is on a clay slip, the other on the vein. There the vein ended. Defendant's witnesses testified it was cut off by the Deadwood, and, as the Deadwood is admitted a "Blue" vein, urge this as proof that the Jersey Blue is of older age than the Deadwood, and so not a "Blue" vein. For the next 150 feet, and to the Rainbow, defendant's witnesses testified the workings are in highly mineralized and altered granite, filled with what Finch described as crisscross quartz seams or stockwork and Emmons as a sheeted zone of closely-spaced parallel quartz seams with some cross quartz seams, and which is claimed by them to unite the Jersey Blue, so continued, with the

broad side of the Rainbow. They placed the limits of this stockwork or sheeted zone continuation of the Jersey Blue at walls 20 feet apart and in undeveloped country. Beyond the Rainbow, there 24 feet wide, some of them testified that the Jersey Blue likewise continued to the discovery shaft and beyond and across the Blackrock east end line.

On suggestion that they were virtually describing the Jersey Blue as crossing the Rainbow, they explained both veins merged into each other, or in a hub of mineralization around the discovery shaft, and as one vein branched in four directions. Defendant's sampler testified that, as these workings were run, he sampled all vein matter and quartz disclosed; that from where the Jersey Blue ended, 100 feet from the old drift face in the new drift, he went east 36 feet for the next sample, then east 53 feet for the next, then east 83 feet for the next, which was in the Rainbow; that in the parallel drift from opposite the point aforesaid he went east 22 feet for the next sample, then east 60 feet for the next, then east 22 feet, then 20 feet, then 20 feet for the next in the Rainbow. Westward in old workings, where the vein is unquestioned, he sampled at 10-foot intervals. Plaintiff's witnesses testified that the Jersey Blue ended and was not cut off by the Deadwood; that from there to the Rainbow is only unaltered granite, with no stockwork or sheeted zone and no quartz seams, save the insignificant ones and joint seams in the granite of the district everywhere; that from near the old drift face the main part of the Jersey Blue coursed southeasterly, along which a drift was run until it reached and was cut off by the Blackrock fault along the north side of the Rainbow; that the drift was continued through and to the south side of the Rainbow and the Jersey Blue there found and drifted upon for 100 feet. No segment of the Jersey Blue was found in the Rainbow where the drift crosscut it, and this, plaintiff's witnesses explained, is due to the fact that there the Rainbow is between two branches of the fault; that they did not think to develop to find it, though movement had so crushed the Rainbow it probably would not be found. Defendant's witnesses testified that what in plaintiff's behalf is there described as the Jersey Blue is only a fault gouge transverse to Jersey Blue structure and having in it some irregular bunches of quartz.

On the Blackrock 400 level, the Jersey Blue is not developed to the north side of the Rainbow, but from a crosscut entirely through both claims plaintiff drifted west 100 feet 'to the Rainbow, upon what its witnesses claimed is the Jersey Blue, consisting of parallel gouges and quartz 2 feet wide, faulting the Rainbow and ending within the latter against the Blackrock fault. Defendant's witnesses describe this as nothing but a branch of the Blackrock fault, and not the Jersey Blue. On the Blackrock 700 level conditions and testimony are like to that in relation to the level last mentioned, save that the Rainbow is plainly more faulted by what plaintiff's witnesses describe as the Jersey Blue on the south side of the Rainbow; and upon this is a raise to the Elm Orlu 800 level, 40 feet above. On the 800 level the Jersey Blue is developed on the north side of the Rainbow, and plaintiff's witnesses testified it curves northeasterly for a distance along the Blackrock fault,

there the Rainbow north wall; that on the south side of the Rainbow it appears in a short easterly drift upon it. Some of the defendant's witnesses testified that in the drift upon the north of the Rainbow the Jersey Blue does, not reach the fault, but departs from the south side of the drift, and the veins "have to unite" in "undeveloped territory," though Emmons testified it did proceed along the fault as stated by plaintiff's witnesses. Here the fault has four branches in the Rainbow, and Emmons testified that because of probable diverse movement between and along them, the Jersey Blue south of the Rainbow, if it crossed, might be looked for within 200 feet either way.

On the Blackrock 900 level Greene testified that on the south side of the Rainbow the latter is cut off by the Jersey Blue, and he is unable to say why the western segment of the Rainbow does not reappear in workings farther west, unless faulted beyond them. There are no workings on the Jersey Blue immediately north of the Rainbow, and no other witness refers to this place. On the Blackrock 1,000 level Greene and Irving testified that on the south side of the Rainbow the latter's ore body is cut off by the Jersey Blue, and that the Rainbow's western segment is not observable. The working in which this is said to be seen crosses through to the north side of the Rainbow and then along the Jersey Blue on the said north side. Greene further testified that the Jersey Blue there north of the Rainbow is but 8 to 10 inches wide, and on the south side it is 4 feet wide. No other witness referred to this place, save Finch, who testified that in a working north of the Rainbow is a positive, actual junction developed between the two veins; but the point he refers to is in what defendant's map depicts as "horse-tail" structure from the Jersey Blue and north of the Blackrock fault, which is along the hanging wall of the Rainbow. In reference to the Blackrock 1,100 and 1,200 levels Searls testified that in stopes below the 1,100 and across the Rainbow he saw the Jersey Blue cutting and "terminating absolutely" the bands of zinc ore of the Rainbow, "just as distinct in the stope as it is here on this paper" (an illustrative sketch), and that it was unquestionably the Jersey Blue, because also visible in a drift four feet below. Greene testified that the stopes at the 1,100 on the south side of the Rainbow end against a northwest fault he believes to be the Jersey Blue; that he could not say how wide the Jersey Blue is there, as it was lagged, but in the stope it was 3 or 4 feet wide; that on the 1,200 on the north side of the Rainbow the Jersey Blue faults the Rainbow, and that on the south side of the Rainbow for 80 feet it cut off the big stopes in the Rainbow ore body. No other witness refers to these places, save Finch, who testified that on the 1,200 in the crosscut a little farther west and on the north side of the Rainbow is a "definite junction of the two veins developed," though, he says, undoubtedly they also join farther west at this elevation; that the junction is not along gouge, but in the midst of a mass of ore. And there again he pointed it out on defendant's map in "horse-tail" structure from the Jersey Blue and north of the Rainbow hanging wall. In reference to the Blackrock 1,300 level plaintiff's map depicted the Jersey Blue within the Rainbow and crossing it at an acute angle, for 400 feet. Plaintiff's witnesses

testified to its existence there in the stopes. Some 20 feet north of where so located on the map, unknown to them, defendant had raised to the Blackrock 1,200, from whence the raise formerly had been carried to the surface. This fact developed while plaintiff's case in chief was in progress.

In defendant's case in chief, its witnesses testified that the Jersey Blue and Rainbow veins are to be seen in the bottom of that raise; that on the level the lagging had been removed from the raise to the south side of the Rainbow; that the exposure across was solid zinc ore, without transverse fissures or gouge, and for 35 feet. Finch testified that in the raise and 25 feet above the sill of the 1,300 level the Jersey Blue and Rainbow "are seen to be united," but as it conclusively appears that the veins are converging at the first floor of the raise, he again places the union in "horse-tail" structure, if anything, and north of the hanging wall of the Rainbow. Salisbury testified he was in the raise, and the veins "should come together about at the sill floor," which was "not now open to observation"; that in the stopes east of the raise "there is well exposed the so-called crossing of the Jersey Blue vein of the plaintiff in the midst of the so-called Rainbow lode of the plaintiffs"; that "the crossing is not very evident, but the thing which seems as I interpret it to be the Jersey Blue vein of the plaintiff * * * is, as I interpret it, a slip through the ore of" the Rainbow; that "the slip is distinct"; that in reference to the structure of the ore following the slip he did "not so interpret it"; that at the Rainbow north wall the structure parallels it for 3 or 4 feet very distinctly, but further south ceased to be banded, and he would speak of it as having the structure of the granite it had displaced, and it is that structure which is the so-called Jersey Blue crossing; that the slip has gouge, with walls perfectly well defined, and "if you stand at just the right place" there seems, so far as the walls of the gouge "are concerned, a structure of ore running in that direction, but I could make out" that there was other structure "than that which seems to be outlined by the two walls of the gouge"; that on the south "that structure does not seem to me to obtain"; and that the so-called Jersey Blue had a strike more nearly east than on plaintiff's map and seemed to be merely a fault slip made after the ore was formed. Burch testified that on the level he could not find the Jersey Blue where plaintiff's map placed it; that from the raise south, where the timbers were removed for the width of 30 feet of the Rainbow, is almost solid zinc ore, without gouges or slips or transverse structure; that looking up at the foot of the raise he could not tell how the structure of the zinc ore dipped; that it is not appreciably banded, but is irregular blocks, appearing more like the original granite structure; that he did not see anything that looked like "the ore coming down and being faulted"; that looking at the ore and rocks just southerly of the foot of the raise it is not evident that the bands of the Rainbow vein coming down are faulted by a southerly dipping fault—nothing that he "could possibly interpret in that line." Wiley testified that in the raise the veins united and below are one—"come down and join as in that model can be seen"; that east of the raise, in the stope and in the Rain-

now are "two little mud slips" 10 feet apart, striking north 85 degrees west and dipping south 75 degrees; that one is a "very distinct gouge or mud slip" and without banding parallel to it, "except as you may have banding in the Rainbow lode itself"; that from the raise south across the Rainbow is "no plain diagonal structure of any kind cutting through there"; that there is hardly a stope in the mine where you cannot see these little gouges in the ore and along them the ore breaks, requiring extra timbering.

Two days before the testimony concluded, plaintiff's witnesses visited the raise at that 1,300 level, and after defendant rested Greene testified that in the west side of the raise at the first floor is a well-defined vein with two wall gouges separated 5 feet, and in which next the south wall are 6 or 8 inches of quartz practically vertical, and next the north wall is about the same amount of quartz and zinc ore, between them being altered granite containing little seams of quartz and zinc; that immediately south of this vein is rich zinc ore banding, approaching and abutting against it at a dip of north 53 degrees; that the north wall gouge (referred to as the Jersey Blue) appears east of the raise and diagonally crossing the drift at the first floor, still dipping steeply; that along the north side of that drift and the stope farther east is a strong gouge wall dipping north 80 degrees to apparently normal Rainbow dip of north 64 degrees; that south of this wall is very solid zinc ore, and six sets south is a gouge having along it 8 inches of quartz, with some pyrite and a little zinc in it, striking north 73 degrees west and dipping south 79 degrees; that it goes up to and across the back of the stope and "could be followed as you would follow one of these pilasters" of the courtroom, disappearing in the stoping; that south of that gouge is the solid zinc ore of the Rainbow. On cross-examination he sought to explain his former testimony and the map, and testified that in his opinion the Jersey Blue in five branches crosses the Rainbow on that level. He also testified to gouges in the Rainbow and due to internal movement.

Irving testified that in the west side of the raise at the first floor he saw and entered in his notes "10 to 18 inches of quartz with some gouge cutting the Rainbow banding"; that the Rainbow banding seemed to come in on the south side of the raise and toward the vein described; that the vein last aforesaid dipped practically vertical and is of strike probably more west than north 70 degrees west; that it is the Jersey Blue, or a strand of it; that east of the raise in the stope he saw that vein in the Rainbow, and he described it about as did Greene, his notes reading, "nearly vertical very strong wall opening Rainbow material, good gouge, north 80 degrees west"; that in the west end of the stope he saw and in the roof he saw, as he read from his notes, "beautiful vein, unmistakably Jersey Blue, about 6 or 8 inches good vertical zinc in it," which he considered the Jersey Blue or a strand of it. On cross-examination he testified that he could not see the bottom of the raise; that he thinks there are two strands of the Jersey Blue at that level, one in the raise and one in the stope, probably overlapping, and that there may be more; that the strike of the strand in the stope is north 80 to 85 degrees west and the dip is south

73 degrees; that in the stope he did not observe Rainbow banding—— "very definitely to decide whether it was cutting across the banding or not"——but the Jersey Blue dips in the opposite direction to the usual dip of the ore; that at an acute angle it cuts across the Rainbow banding that is a little farther north and dipping north; that the Jersey Blue there forms "a vein which shows in the roof beautifully," about 12 inches wide; that north of the Jersey Blue in the raise is ore which may be part of the Jersey Blue; that if the two strands of the Jersey Blue continue on strike till opposite each other they will be 18 feet apart, though the one in the raise likely "peters out" and an overlapping strand continues the Jersey Blue.

Searls testified that in the raise the Rainbow plain banded structure dips north 55 degrees, and across and cutting and breaking it down is a plain south wall of at least that portion of the Jersey Blue, nothing obscure nor hard to see, dipping vertically; that the polishing and slickensiding of the previously existing ore with striations to the east at an angle of 15 degrees to the strike are plainly observable on the Jersey Blue south wall, which strikes north 77 degrees west; that the wall is a thin gouge, and next to and plainly across the severed strands of ore are 10 inches of parallel quartz, lying right against the north dipping structure of the Rainbow; that the Jersey Blue the width of the raise to the north is vertical structure, zinc and quartz banded, absolutely vertical; that in the drift east from the raise the Jersey Blue can be seen in a corner at least 6 feet wide, diverging to the south, with a strike north 60 to 65 degrees west; that the angle between the hanging walls of the veins, 30 degrees, can be seen very clearly defined in the roof of the drift, and that it is perfectly obvious that the Jersey Blue departs southeast from the drift; that where these two hanging wall gouges are together it is impossible to see one gouge cut through the other, and they are apparently merged for 6 feet on strike, though the intersection on dip is plain, as in the raise can be seen the Jersey Blue gouge of vertical dip; that the Jersey Blue south wall cutting across the Rainbow in the raise and its north wall cutting across the Rainbow in the drift are "just as plain as that same wall of the court-room"; that in the level and stopes the Jersey Blue structure does not all persist, but is interrupted strands, which is common where veins cross from one variety of country rock to another, the Rainbow here being of the nature of country rock to the Jersey Blue; that four floors below the level he could see the Jersey Blue with a strong blue gouge and parallel zinc banding cutting the Rainbow wall and travers-ing it diagonally, the same Jersey Blue he saw in the workings at the level. On cross-examination he testified that from the raise he saw no strand that died out; that 10 feet up in the roof of the stope, where Irving saw the beautiful vein, he saw some white material which he thought is quartz, though he did not try to inspect it closer; that in Rainbow stopes are almost innumerable small cracks like one on the 1,300 level he thought might have occurred at the time the Jersey Blue faulted the Rainbow.

Winchell testified that a pile of muck concealed the level below the raise, but at the first floor he saw the Rainbow solid mass of zinc ore

dipping flatly north 50 to 60 degrees; that the Jersey Blue there dips southerly, or nearly vertical, "going directly across the banded struc-- ture of the Rainbow." He then describes it in the drift east from the raise and in the stope approximately as did Searls. He further testified that veins will split when they encounter harder material, and the fis- sures in the latter will "heal" and leave little evidence of crossing; that this has happened where the Jersey Blue crosses the Rainbow; that on the 1,300 level the Jersey Blue crosses the Rainbow at an acute angle and is split into stringers; that the like occurs on the Blackrock 1,400 level, and he correlates the strands in these two levels. He was not cross-examined.

Weed testified he agreed generally with Greene, Irving, and Searls in reference to the situation in the raise and stopes on that level.

In rebuttal Finch testified that in a new westerly drift from the stope of the 1,300 a strand described as of the Jersey Blue by plaintiff's witnesses is a mud seam or gouge, taking a strike of south 73 de- grees west. Burch testified that "mud seam" dwindled to a crack, as did Wiley.

The judge twice visited this raise at the level, but conditions were such at the last visit that it added nothing to judgment. On the Blackrock 1,400 level and stopes above it, all below the point of alleged union, Greene testified that in stopes and crosscuts the Jersey Blue could be seen in the Rainbow. Irving testified that in a stope four floors above the level the Jersey Blue is found cutting the Rainbow. Searls testified that on the ninth floor above the level the appearance is of another vein coming in the stope; that the banded zinc ore of the Rainbow striking slightly northeast comes up against and is terminated by a distinct vertical gouge, the zinc ore being dragged around slightly and crushed into breccia; that "this structure" strikes north 70 degrees west, dips vertical, and is traceable across the stope to the end of that floor; that the conclusion is irresistible that the Rainbow is there broken and cut off by a later vein. He further testified veins often cross without faulting. Winchell testified on this level the Rain· bow is faulted along its south side, in the stopes, by the Jersey Blue; that the Jersey Blue is about 8 feet wide in a crosscut there south of the Rainbow. Finch testified that on this level, to his knowledge, no vein crosses the Rainbow as depicted on plaintiff's map, though there are some fault slips. Burch testified to transverse seams of gouge there, but so far as he could see or find for lagging there is only the Rainbow. So, likewise, Wiley.

The Elm Orlu 1,500 level is 40 feet above the Blackrock 1,400 level, and from the former a crosscut was run into the Blackrock. Greene testified that therein the Jersey Blue is found cutting through the Rainbow and that the veins showed different structure. Irving testi- fied that there at one point the Jersey Blue is wholly in the Rainbow; that the latter dips north 45 to 50 degrees, and the former dips 87 degrees—nearly vertical; that the Jersey Blue banding goes directly through the Rainbow banding and it is a vein made up of pink man- ganese—"the clearest case" of crossing he knows of. Finch testified that what the plaintiff's witnesses call the Jersey Blue on this level

is nothing but fault gouges, as does Wiley. Neither specifically refers to the pink manganese mentioned by Irving. On the Elm Orlu 1,700 level a northeast crosscut from the Elm Orlu shaft to near the Blackrock west end line is claimed by plaintiff's witnesses to have cut near its face the Jersey Blue entirely through the Rainbow and south of it. Some development was done by drift and raise. Defendant's witnesses are of contrary opinion. This crosscut, 600 feet long and in progress during the trial, cuts more than eight veins and five slips, of varying sizes, strikes, and dips.

In reference to the Creden vein defendant's witnesses testified it united the Rainbow and Jersey Blue, and plaintiff's witnesses that it diverges from the Rainbow and is cut off by the Jersey Blue. So far as appears it is a strand of the Rainbow, diverges from the latter's north side in the Elm Orlu at depths of 1,000 to 1,200 feet, extends no farther east than crosscut 1,218 on the 1,200 level and the Blackrock west end line on the 1,300 level, strikes northwesterly under both claims, and unites with or is cut off by the Jersey Blue. It is not proven to unite with the Jersey Blue. Its apex is probably in both claims. Neither party seems much interested in it, and it is of little importance in itself, though careful investigation might have furnished light upon this issue.

Taking into consideration all the evidence, the inspection, and the undefinable impressions received during the trial, the court is not persuaded that by a preponderance of the evidence it is proven that the Jersey Blue vein and the Rainbow vein unite. Consequently the finding must be and is that they do not unite. At the tunnel level the Jersey Blue ends 150 feet west of the Rainbow. The stockwork claimed to continue it, even if there, has neither strike nor limits. It answers no definition of a vein. Apparently here is one place where Finch found it necessary to some indefinite extent to characterize as vein what in his judgment is not vein. The sampler's conduct during the progress of the work speaks loudly. He found no vein matter or quartz for 53 feet in one drift and for 60 feet opposite in the parallel drift, when the ground was fresh and no timbering to obstruct his view. Plaintiff's evidence that here is only country rock permeated with the joint and quartz seams common throughout the district is persuasive and superior in weight to that of the defendant. Defendant's contention that the Jersey Blue is faulted by the Deadwood is not supported by the evidence. Some small slips are probably at or near the termination of the Jersey Blue, but to correlate them with the Deadwood requires a series of sweeping curves and projections unwarranted by any development upon the Deadwood there or below, and impossible in these premises. On the Elm Orlu 800 level, where union is next claimed, the Blackrock fault separates the veins, and by Finch the union is placed in the slightly mineralized country in undeveloped territory between veins. The other points of developed union claimed are on the Blackrock 1,000, 1,200, and 1,300 levels, and in every instance by Finch, who alone purports to have perhaps seen them, are placed in the mineralized country between the veins. This is not union within the meaning of the statute. The veins have not merged and lost their

identity in the mineralized country between them, even if it is sufficiently mineralized to be classed as ore. Both veins are there distinct and within clearly defined walls. The mineralized country is not part of either vein, and, if ore, is, as Emmons testified, ore between the veins.

The conditions at the Blackrock 1,300 level and the testimony in relation to them are somewhat surprising. It is remarkable that defendant's witnesses said so little, not only in chief, but in rebuttal, of the appearance of the veins at the first floor of the raise and in the walls of the stope. They, too, returned and reviewed the place about the time that plaintiff's witnesses first viewed it. Finch testified that in the raise and 25 feet above the level the veins "are seen to be united," and his colleagues testified they should come together at or blow the level. Finch previously testified the Jersey Blue branches wherever it approaches the Rainbow, so whatever he saw might have been a branch of the Jersey Blue departing from the raise, and which might be one of the strands plaintiff's witnesses testified are in the workings below. Not only did defendant not lower the raise to disclose the actual point of contact of the veins and their relation there, but the floor of the level and the west wall of the raise were obscured, so that none of even its own witnesses saw either. It is apparent that a very limited additional development, or even clearing away obstructions, might have furnished evidence to fully determine the issue. This appears to be the most favorable point of approach of the veins to determine the issue. In so far as the crossing of the veins is concerned, the evidence equally fails to persuade that they do. It is true that conditions and appearances in the raise of the Blackrock 1,300 level tend to support the interpretation of plaintiff's witnesse's, but not to the extent claimed by them. It is also true some of the plaintiff's witnesses testified definitely to and described crossings of the veins at points whereon defendant is wholly silent. And this is significant in this: It is obvious, and also admitted, that if the veins cross at any one point, they must cross at all points, even though so obscurely as to be undiscoverable. But this is not so of union. Every appearance of union and merger may exist at many places, but if one point of crossing is proven, all evidence of union avails nothing and the veins are proven to cross throughout. Healing and cementation may destroy evidence of crossing in many places. Where the "Blue" fractures crossed the well mineralized east-west veins, in most places there was nothing to replace and the fractures healed. Only where there was yet unreplaced granite would there be much evidence of cross-vein structure.

At the same time, there are so many slips and gouges in the Rainbow, as well as out of it, so much transverse structure in the Rainbow, and so much obstruction to the view, that it is easy for the expert to be deceived, or to deceive himself, and to misinterpret geological phenomena there. "If you stand at just the right place," as Salisbury puts it, may to some extent be taken figuratively as well as literally. The Blackrock faults have so complicated the situation that it is doubtful if the problem is capable of solution. Whether they

united or crossed, the movement along the Blackrock fault strands appears to have cut off and shifted the point of convergence of the veins at many, if not all, places, and the original point may be undiscoverable, the continuity of the Jersey Blue destroyed. Emmons believes the throw of these faults may have been in several directions and for as much as 200 feet either way. The Deadwood may indicate less throw. In these premises where veins cross as often or oftener than they unite, converging strike and dip are not presumptive of union. It is admitted "Blue" veins cross obscurely—that the Deadwood does so. This latter crossing has been stoped by the defendant in connection with the Rainbow, but beyond the testimony that the crossing is obscure, there is little in evidence by way of comparison with the Jersey Blue at union or crossing and south of the Rainbow.

[16, 17] In view of all the circumstances, and that reasonable and learned men may honestly differ in their interpretation of geological phenomena in these premises, the court is constrained to say the evidence is in equipoise; and so the determination is dictated by the burden of proof. Even as defendant fails to prove the veins unite, so would plaintiff fail to prove they cross, if the burden of proof was upon it. A principle of law, however, demands that the court shall find that the veins do cross. Defendant alleges they unite and claims an estate by reason of it. Plaintiff denies they unite, and alleges they cross, and admits a different estate in defendant by reason of it. Though defendant fails to prove the union, and the estate it claims, the law is it must be awarded the estate that plaintiff admits or concedes to it. And accordingly the finding is that the veins cross, and, save at the intersection, defendant is entitled to all ore bodies in the Jersey Blue south of the Rainbow and wherever it goes or where plaintiff admits it goes, if not otherwise found. The Rainbow strand easterly from the Blackrock discovery shaft extends about 400 feet east and to within 250 feet of the Blackrock east end line, where it is cut off by a northwest fault. Even at the discovery shaft it is east of any extralateral rights of plaintiff. No discovery shaft was required when the Blackrock was located. Both the Jersey Blue and the Rainbow were discovered when the location was made, or at least before the patent entry. Evidently the cropping of the two veins gave the appearance of one continuous east-west vein and the location was made accordingly. Neither the Jersey Blue nor the Rainbow is a secondary vein. Both are primary. The Jersey Blue overlaps the Rainbow. Extralateral rights based on it extend east beyond where the like rights based on the Rainbow begin. Indeed, taking the course of the Jersey Blue where fixed by plaintiff south of the Rainbow, it is probable it crosses the Blackrock south side line east of the Elm Orlu east end line. That the Rainbow crosses both side lines is not controlling. There can be but one set of end lines, and if the located end lines fix extralateral rights upon one vein, as they do upon the Jersey Blue, they fix them upon all veins.

[18] Although it is immaterial whether or not the easterly strand crosses the Blackrock east end line, it is observed that where it is cut off by the northwest fault old stopes show it about 20 feet wide. From

the fault to the east end line the facts are much the same as from the Jersey Blue termination west of the discovery shaft and to the Rainbow on the tunnel level. This is another place where it would seem that Finch characterizes as vein what in his judgment is not vein, and to an indefinite extent. For defendant it is claimed conjugated quartz seams, stockwork, east of the fault and 250 feet to and across the east end line, are the continuation of the easterly strand of the Rainbow. Plaintiff contends the easterly strand has been cut off by a northwest fault, and that east of the fault is but country, with some quartz seams parallel to the fault, and some joint and other quartz-filled seams common to the country. Nothing appears here for the distance of 250 feet to satisfy the definition of a vein. Again is no strike or boundaries, save for some individual northwest quartz seams. This stockwork, if it exists, does not measure up to Salisbury's illustration of interior stockwork on strike connecting two separated segments of a vein. Here the stockwork is claimed to extend 250 feet from the segment of the vein to the west, but no connected segment to the east appears.

It is probable that the eastern segment of the easterly strand was faulted to the north and may appear in a trench north of the Blackrock north side line. And this may be the apex of the great ore bodies at depth in the easterly part of the Blackrock. Considering the evidence in connection with the patent presumption, it does not persuade that the easterly strand crosses the east end line.

[19] In the matter of the estoppel by deed claimed by defendant, in August, 1906, plaintiff executed to defendant's predecessor in interest an option to purchase "all of the right, title and interest" of plaintiff "in and to the Blackrock quartz lode mining claim—being an undivided one-quarter thereof." This was recorded October 31, 1906. October 26, 1906, plaintiff's directors adopted a resolution of sale to the optionee and authorizing its officers to execute to him a deed of "an undivided one-quarter interest in and to that certain quartz lode mining claim known as the Blackrock quartz lode mining claim; * * * it being the sense of the board of directors that said company shall convey * * * all of the right, title and interest" it has "in and to the above described property." This was recorded May 1, 1907. October 29, 1906, plaintiff executed to the optionee a deed reading that plaintiff—

"does remise, release and forever quitclaim unto the said party of the second part, and to his successors forever, all the right, title, interest, claim and demand of the party of the first part in and to that certain portion, claim and mining right, title and property on those certain ledges, veins, lodes or deposits of quartz and other rock in place, containing precious metals of gold, silver and other metals, * * * the following described mining property, to wit: An undivided one-quarter interest in and to that certain quartz lode mining claim known as the 'Blackrock' quartz lode mining claim. * * * It being the intention of the party of the first part to convey to the party of the second part all its right, title and interest in and to the above described property. Together with all the dips, spurs and angles and also all the metals, ores, gold, silver and metal-bearing quartz, rock and earth therein, and all the rights, privileges and franchises thereunto incident, appendant and appurtenant, or therewith usually had and enjoyed; and, also, all the estate,

right, title, interest, possession, claim and demand whatsoever of the said party of the first part of, in or to the said premises and every part or parcel thereof."

November 1, 1906, the optionee and grantee in said deed conveyed all received by virtue of it to others, who in turn conveyed to defendant. Defendant's contention is that in any event by this deed plaintiff conveyed one-quarter of any ore bodies beneath the Blackrock that apex in the Elm Orlu and also the like portion of any ore bodies beneath the Elm Orlu that apex in the Blackrock and which otherwise might belong to plaintiff. To maintain this contention defendant appeals to Montana Mining Co. v. St. Louis Mining Co., 204 U. S. 204, 27 Sup. Ct. 254, 51 L. Ed. 444. But that case is distinguishable from this. There the deed was to settle litigation and was of a portion of the St. Louis claim, "together with all the minerals therein contained." A vein apexing in said claim dipped under the deeded portion. And the court held that the segment of the vein under the deeded portion was "therein contained" and so was conveyed by the deed. Although the court rested the decision somewhat on the rule of common law, it seems clear that in any view the segment of the vein was *in* the deeded portion—was "therein contained"—and within the intent of the deed. A vein apexing in a claim is *in* every part of that claim under which it dips. But in the case at bar there was no litigation to settle. Veins apexing in the Elm Orlu and to which that claim possessed extralateral rights were not *in* the Blackrock, though they dipped under its surface. Nor were they carved out of the Blackrock, for never were they *in* it. The property conveyed by the Elm Orlu patent was not a rectangular block to the center of the earth, but was such block with all projecting veins apexing therein wherever they extended; and those projecting veins were as distinct and separate from the surface beyond the Elm Orlu under which they dipped as like surface projections nearly surrounded by adjacent property would be from it; and no more *in* it in the former case than in the latter. Clearly, a deed of land and all *therein* would not convey land projecting in and nearly surrounded by it.

Suppose this deed was of warranty; would plaintiff be liable when the owners of other veins dipping under the Blackrock, of which there are doubtless some, assert their rights thereto? Are those veins *in* the Blackrock? And if not, why are these of the Elm Orlu? The option was to convey the Blackrock only, not any part of the Elm Orlu. There is nothing to show that the optionee had any knowledge plaintiff owned the Elm Orlu. The circumstances and the language of the deed warrant the construction that only the Blackrock and its extralateral rights were within the intent of the parties. Giving effect to every one of the profuse words in the deed, this seems the right conclusion. The same is true of such portions of veins apexing in the Blackrock and dipping under the Elm Orlu. If the facts are such that by virtue of location and patent, not the Blackrock's extralateral rights, but the Elm Orlu's attached thereto, those portions were not *in* the Blackrock, but were *in* the Elm Orlu from the beginning. The claim of estoppel fails.

It appears that each party has mined ore that is the property of the other, and accounting will be had. From the findings the conclusions and the decree are clear. Plaintiff is owner of and entitled to all ore bodies in dispute (1) in the Rainbow vein throughout depth between the Elm Orlu west end line and a parallel line projected from the Rainbow south wall apex crossing of the common side line; (2) in the Creden vein so far as its apex is within the Elm Orlu and between end lines there projected; (3) in the Pyle strand in so far as its apex is within the Elm Orlu and between end lines there projected. Defendant is owner of and entitled to all ore bodies in dispute (1) in the Rainbow vein throughout depth east of where the Rainbow south wall apex crosses the common side line and the Elm Orlu end line there projected; (2) in the Creden vein in so far as its apex is within the Blackrock and not within Elm Orlu end lines projected where the Creden vein apex departs from the Elm Orlu; (3) in the Pyle strand in so far as its apex is within the Blackrock and east of the Elm Orlu end line or the end line projected where the Pyle apex crosses the common side line; (4) in the Jersey Blue vein throughout depth save where it crosses the Rainbow vein between the Elm Orlu west end line and the end line projected at the Rainbow south wall apex crossing of the common side line. Each party will pay its own costs.

A great chancellor once said that the test of a good decree was that it satisfied neither party. If that quality attaches to this decision some consolation ought to be found in the reflection, not of influence in the decision, however, that each party is awarded everything and deprived of nothing that, apparently, it thought itself entitled to until recently.

Upon accounting had, defendant waived in respect to its ores taken by plaintiff. It appears defendant's taking of plaintiff's ores was continuous from March, 1910, to May, 1913, both inclusive. The place was the Blackrock 1,200, between the Blackrock west end, and the 301 plane established at the Rainbow apex crossing of the common side line, and from said vein where bisected on strike by said side line. In 1910 there were no workings above that point that served to determine what vein (and where was its apex) was being mined by defendant.

Plaintiff having access at all times to defendant's workings with its consent, in June, 1910, observed defendant was taking said ores from beneath the Elm Orlu, and claimed a trespass. Later inspection disclosed like taking by defendant from beneath the Blackrock. At some time subsequent to March, 1910, plaintiff took some of defendant's ores from the same vein beneath the Blackrock. A controversy arose in respect to all said ores and more, and was the subject of discussions, negotiations, understandings, and agreements between the parties. In March, 1912, they agreed that "to facilitate the settlement of the controversy as to the ownership of said ores and ore bodies from which ore has been extracted, if any, by either of the parties hereto, and to provide a reasonable length of time within which the parties may negotiate, * * * and endeavor to complete a settlement as to the

ownership" of "ores heretofore extracted, * * * and which may hereafter be extracted," and of ore bodies, they would for three years waive the plea of limitations in any suits involving said ores and ore bodies. In July, 1912, "to afford both * * * ample opportunity of determining the disputed matter to the satisfaction of both," and without waiver of rights or acknowledgment of claims, they agreed upon certain areas within which neither would extract ores until by exploration work they might determine the location, extension and apices of the ore bodies "as soon as we can conveniently do so," both privileged to do development work and to inspect therein, and that "a record of the tonnage of all ores extracted and the assay values thereof shall be kept by both companies for the purpose of accounting for the same after the ownership of such ores shall have been determined."

Later in the same month, to determine the location, position, and apices of the veins and ore bodies and to facilitate the settlement of the disputes, they agreed that each with diligence would do certain development for and at the expense of the other. Development work progressed, and in July, 1914, so far determined "the disputed matter to the satisfaction" of plaintiff, but not defendant, that plaintiff commenced this suit. The next month, in lieu of injunction pendente lite, for economic reasons, and not by way of limiting rights or admitting claims, they agreed upon areas wherein neither would mine, and areas wherein each might mine to the exclusion of the other, expressly stipulating that each was given the right pending suit to mine ore bodies claimed by the other, each to keep account of ore mined and places where, to be furnished the other on request, that the agreement would endure until decree herein, and that prior understandings and agreements in reference to reciprocal development work would continue.

[20] Neither party demanded accounting prior to suit, and each demands it from the other, in the pleadings herein. During the accounting and now it is plaintiff's contention that, in so far as the ores are concerned, the suit is for damages for conversion of personal property. Defendant urges that it is for accounting in equity for the value of portions of realty severed and removed. This is material, in that by reason of the advance in the price of zinc, due to the war, the award to plaintiff might be about 1,000 per cent. greater under its theory than under defendant's. The decision heretofore is not accurate in its characterization of the suit. Both parties alleged ownership, unfounded adverse claims beclouding title, underground trespasses and removal of ores (secretly and willfully, plaintiff alleges; wrongfully, defendant alleges); that the amount and value of such ores can be ascertained only by discovery and accounting; and that the adversary threatens to and will, unless restrained by the court, remove and convert all ores, or the value thereof, inflicting irreparable damage. The prayers are to quiet title, to enjoin assertion of adverse claims, to enjoin further entry and mining and taking ores, that the adversary "be required to account for all ores" taken, and the complainant have "decree for the value" of such ores wrongfully taken, and for other and further relief. The suit, in so far as the ores are concerned, is not for damages eo nomine, but for accounting for the

value of ores taken. Neither in form nor theory is it for damages for conversion of ores as personal property. And plaintiff, having elected its remedy, cannot now, dazzled by the possibilities perceived in the subsequent spectacular rise of zinc, choose another, that does violence to its bill of complaint.

[21] Furthermore it is doubtful if conversion of ores is made out. Certainly it is not in respect to those taken subsequent to the agreement of July, 1912—a compromise agreement. When disputed property is in part taken by both claimants under an agreement that, when ownership is determined "to the satisfaction of both," an accounting and settlement will be had, the taking is not conversion, it sounds in contract, is lawful, resembles mutuum of Roman law, in legal contemplation is a sale at common law, and the only remedy is to determine ownership and compel the promised accounting. The conduct of the parties and all other evidence are persuasive that the difficulties in the way of a determination of ownership of the ores induced an understanding for mutual advantage, labor and aid to that end, pending which both might mine some of the ores, dispose of them with other of their own, and, ownership determined, accounting would be had in respect to all ores taken whether before or after the agreement of July, 1912, a balance struck and paid. The stipulation in said agreement that it was without waiver of rights and without acknowledgment of claims cannot refer to taking and accounting for ores as therein agreed, and seems of superfluous precautionary words relating to the disputed ownership and not to remedies. As this view has not been urged, and is unnecessary to the decision, it may be left here.

In deference to the argument herein it may be observed that though in equity relief is limited to compensation, and damages in the sense understood at law are not determined and allowed, save where a court sitting in equity is so authorized by some statute (see Root v. Railway Co., 105 U. S. 215, 26 L. Ed. 975; 2 Dan. Ch. *1080), yet in view of the duty to herein administer local law (see Railway Co. v. Telegraph Co., 234 U. S. 376, 34 Sup. Ct. 810, 58 L. Ed. 1356; Trust Co. v. Krumseig, 172 U. S. 358, 19 Sup. Ct. 179, 43 L. Ed. 474) no reason is perceived why the local statute authorizing the injured party to elect the highest value between conversion and decision, creating a substantive right, should not be applied herein, had conversion been counted on and maintained.

[22] The ores taken by defendant aggregate 31,825 tons. Plaintiff admits those taken from beneath the Blackrock were taken in honest belief that defendant owned them, but contends otherwise in respect to those from beneath the Elm Orlu. This contention is founded upon the presumption that ores beneath a claim are presumed to be of that claim, in the absence of proof that they are in a vein apexing without it. In the face of the admission the contention fails. At the time when taken the ores were known to be of a single vein and at places where the same portion of the apex would control the ownership of all of them. Hence defendant, honestly believing it owned the ores

beneath the Blackrock, obviously likewise believed it owned those beneath the Elm Orlu.

[23] In accounting in equity for portions of realty served and appropriated under honest belief of ownership, no other injury appearing, the award to the owner is the value in situ. This is arrived at in the case of ores by deducting the reasonable cost of mining and marketing or reducing to money, or what it cost the trespasser, if less, from the amount that ought reasonably to have been then received for or from them; the balance being their value in situ and the award to the owner. See Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856. In this case the ores contained 20.5 per cent. zinc, 6 oz. silver, and 40 cents gold per ton. The parties are in accord that in the then state of the science of treatment of like ores, 65 per cent. recovery and 48 per cent. concentrates, was reasonably good practice. Plaintiff claims to have done better in treating like ores, and defendant slightly less in treating these ores. This reasonable result, in view of the law aforesaid, is the basis of recovery herein.

Defendant mined and milled the ores in connection with operations of which these ores were about 7.6 per cent. Allowances to defendant are, per ton of ore, $2.33 for mining, 17 cents for freight to mill, $1.19 for milling, and $2.06 for freight to the nearest purchasing smelter. For general expenses nothing is allowed, in that segregation is impossible, and nothing appears to show that defendant expended anything during the trespass that it otherwise would not. For instance, engineers, firemen, supervision, office help, shaft repairs, pumping, power, air, etc., were doubtless not appreciably increased. The theory of allowances is that the trespasser expended what the owner otherwise would have. But here, aside from direct mining and milling and freight, none such was expended.

[24] To illustrate; the defendant's drifts and sill floors will not relieve plaintiff from duplicating them to reach the same place and mine the balance of the same ore body. No freight to mill can be allowed beyond what it would have cost plaintiff to transport the ores to its own mill. The suit is for compensation to plaintiff, not to defendant; otherwise, if defendant transported to mill so far that freight absorbed all profit, plaintiff would be without remedy. The price received for the concentrates from the smelter equaled 82 cents per ton crude for all metals save zinc, and $105,118 for the zinc therein. The zinc values are arrived at by computing the values of the ores mined in each month, at the average price of zinc when reaching market the succeeding month, at the rates then paid by the smelter for concentrates of the recovery and grade aforesaid. Simple interest is awarded on all amounts thus found, from the date of sale to that of this decision. The total award is $177,707.40.

[25] Plaintiff's claim for the values in the mill tailings which defendant did not save is disallowed. Though valuable now, had they been saved, they added nothing to the value of the ores when taken. In the then experimental state of the science in respect to these ores, no buyer would have taken the possibilities of the tailings into account

in fixing a purchase price for the ores, in so far as increased price is concerned.

[26] In the matter of the decree the case was virtually reargued in relation to the Creden vein and Pyle strand. Both parties contend that definiteness requires that the court fix where the Creden apex crosses the common side line. Plaintiff also contends that for the same reason the court should find that the apex of the Pyle strand is in the Elm Orlu, at least as far east of the Rainbow as the Pyle raise, while defendant contends the finding should be that no part of the Pyle strand apex within the Elm Orlu extends farther east than the 301 plane. The findings heretofore made will stand.

A decree should be as definite as the case admits of, and it is believed that a decree conforming to the findings is sufficiently so herein. The evidence demonstrates that the Creden apex is in both Elm Orlu and Blackrock, but does not disclose the point where it crosses the common side line. The same may be true of the Pyle strand. A decree that each party is entitled to so much of said veins as lies within the determined end line planes projected where the apices cross the common side line, can be made certain by following the apices to the crossing.

True, the parties may later dispute the point of crossing, and so new litigation arise to identify, to determine it—the boundary line; but that is no more than is probable in respect to the Rainbow, the apex crossing of which is determined. At 100 places where the Rainbow dips beneath the claim not having the apex, what is the Rainbow, where is the bounding wall, what is ore in the Rainbow, and what adjacent, but without it, may furnish the subject-matter of a hundred suits. A decree may quiet title on a vein but partly developed, on presumptions, from end line to end line, which later may be found to cross side lines and between the same parties require new litigation to identify and fix the point of crossing. Other like situations may be conceived. The inherent nature of the property involved must be had in mind.

It must be noted the suit is not confined to specific ore bodies, but by defendant at least, by virtue of its claim of estoppel by deed, was broadened to involve every part of the Elm Orlu—every vein apexing in the Elm Orlu, unknown as well as known, that may dip beneath the Blackrock. There are unknown veins within the Elm Orlu; that is, many veins the development of which is too slight to admit of definitely fixing where on strike they cross the Elm Orlu boundaries, or where they dip, as undoubtedly some of them do, beneath the Blackrock. Doubtless, too, are veins wholly unknown in unexplored Elm Orlu territory. Is not plaintiff entitled to a decree quieting its title to all such veins in so far as their apices may be found to be within the Elm Orlu bounding planes fixed or projected, and that may be found to dip beneath the Blackrock? Is not such a decree sufficiently definite in view of the circumstances? It is believed the answer must be in the affirmative. And the *decree will be as definite as the patent that conveyed such veins as a part of the Elm Orlu* to plaintiff.

The Pyle strand undoubtedly apexes in the Elm Orlu, and since it

unites with the Rainbow beneath the Blackrock at the 1,100, whereof the controlling portion of the apex is yet unknown, it may at depth further unite where the controlling apex will be found in the Elm Orlu; and a decree following the findings will protect the rights of both parties. Even as it is not known to what extent the Pyle dips beneath the Blackrock, it is not known to what extent the Rainbow east of the 301 plane dips beneath the Elm Orlu.

A decree conforming to the findings and quieting each party's title to all veins apexing in its claim, wherever they dip, would not be impaired, should deeper development disclose union of veins owned by them respectively. For at the union the junior location's vein would be at an end, and below would be only the senior location's vein. Some of the like difficulties attendant upon apex litigation are noted in Keely v. Mining Co., 169 Fed. 603, 95 C. C. A. 99.

Decree accordingly.