CLARK–MONTANA REALTY CO. et al. v. ANACONDA COPPER MINING CO.

District Court, D. Montana. February 18, 1927.

No. 339.

1. Mines and minerals ⚖➡30—Ore bodies within vertical boundaries of claim or veins apexing therein are prima facie property of claimant.

Ore bodies within a claimant's vertical boundaries and veins apexing within such boundaries are prima facie property of claimant.

2. Mines and minerals ⚖➡38(14)—Claimants of ore within vertical boundaries of another's claim, as part of veins apexing elsewhere, have burden of proof.

Claimants of ore within vertical boundaries of another's claim, on theory that it is part of veins apexed without such claim, have burden of proof.

3. Mines and minerals ⚖➡38(2)—Claimants of ore within vertical boundaries of another's claim can recover only on strength of their own title.

Claimants of ore within vertical boundaries of another's claim held entitled to recover only under strength of their own title, not on the weakness, if any, of defendant's title.

4. Mines and minerals ⚖➡38(18)—Plaintiffs held not to have established that ore within defendant's vertical boundaries was part of veins apexing within their claims.

In suit involving title to ore, plaintiffs held not to have sustained burden of proving that ore within vertical boundaries of defendant's claim was part of veins apexing within their claims.

5. Mines and minerals ⚖➡38(18)—Plaintiffs held not to have shown that ore body did not belong to defendant's vein.

Plaintiffs in suit involving title to ore held not to have sustained burden of showing that particular ore body did not belong to defendant's vein.

In Equity. Suit by the Clark-Montana Realty Company and others against the Anaconda Copper Mining Company. Decree for defendant.

J. L. Templeman, W. A. Clark, Jr., Sydney Sanner, and Fred J. Furman, all of Butte, Mont., John C. Higgins, of Seattle, Wash., and William E. Colby, of San Francisco, Cal., for plaintiffs.

L. O. Evans, D. M. Kelly, D. G. Stivers, John V. Dwyer, and John A. Groeneveld, all of Butte, Mont., and Henry McAllister, of Denver, Colo., for defendant.

BOURQUIN, District Judge. This is a mining apex suit. Because of the excessive volume of evidence, it is impracticable to collate and analyze it at length herein. Nor is it necessary, for, though there is irreconcilable conflict of inferences, opinions, and conclusions, in the main there is reasonable harmony in the vital and determinative facts out of which the conflict arises.

Moreover, trial courts, always pressed for time, well might decide forthwith like juries and their special verdicts at most. Five experts testify for each party, viz. for plaintiffs, Burch, of Oregon, Mead, of Wisconsin (U. of W.) Lawson, of California (U. of C.), Simkins, of California, and Roddewig, of Butte; for defendant, Bateman, of Connecticut (Yale), Wiley, of California, and Sales, Steele, and Barker, of Butte.

The premises are in the Butte district. Plaintiffs own the Poser claim, and its east end line is the west end line of the Elm Orlu claim of the Elm Orlu Case. Clark-Montana Realty Co. v. Butte & Superior Copper Co. (D. C.) 233 F. 553. Defendant owns a group of claims, part of the north side line of which is the south side line of the Poser claim.

Titles are by United States patents, date from 1875, and the Poser has priority. The geology is like that in the Elm Orlu Case. The country is granite. The first fissuring resulted in the great Rainbow and other veins of the East-West age; the second, in the Blue fault veins of the Northwest age; the third (in the district, if not in these premis-

es), in the fault veins of Steward age; the fourth, in the Black Rock fault. These master fractures have many branches, and, in addition, the country is permeated with innumerable mineralized joint planes, crevices, seams, veinlets, and veins, to 12 inches in width, slips, faults, and gouges, confused and misleading, a network without strike or dip, incapable of identification or correlation, yet traceable to many real or apparent connections. The whole is that complex geology for which Butte is noted, at once the sometime despair of the scientist and the delight and profit of the expert.

By and large, it offers no great obstacle to practical mining of commercial veins and ores. But when it is attempted to identify and correlate these minor seams or veins with greater ones, the former's abundance, ramifications, and possibilities attach difficulty and danger or impossibility to just solution of the problem. As always, however, where scientists fail to interpret geological phenomena, the law supplies a just answer, viz. the ores are the property of the party within whose vertical boundaries they are found.

The Poser claim is located on and lengthwise of the Rainbow vein, of northerly dip and East-West age, and both are intersected by the Emily vein, of northeasterly dip and Northwest age, which at the surface enters the claim 370 feet west of the southeast corner and departs 50 feet east of the northwest corner. Also, at the surface, a vein, named Poser by plaintiffs and Pilot by defendant, enters the claim at the southeast corner, dips northerly, and courses northwesterly to the east side of the Emily vein. At some depth the Intermediate vein branches from the south side of the Rainbow, west of the Emily, dips southerly, and courses easterly a disputed distance. Various other veins are found in the claim and need no description. And the Black Rock fault of southerly dip courses through the Poser claim from end line to end line.

Within defendant's claims are many veins which, without real dispute, apex therein, viz. the North State, State, North Badger, and Badger veins, of East-West age, southerly dip, and easterly and westerly strike; the Emily, Mill, Jessie, and Edith May veins, of Northwest age, the first two of northeasterly dip, and the last two of southwesterly dip, and all of northwesterly strike; and various other veins. And the Black Rock fault also is therein.

Some 100 to 800 feet south of the Poser claim, and 1,300 to 3,000 feet in depth, are great ore bodies within defendant's vertical boundaries and the veins apexing therein as aforesaid. To some of these ore bodies plaintiffs allege they have superior right. They contend that at the surface of the Poser claim, west of the Emily vein and 100 feet south of the westerly end of the Poser vein on the east side of the Emily vein, the continuation of said Poser vein appears; that the entire vein is of Steward age; that west of the Emily it dips southerly and courses westerly to and across the west end line of the Poser claim; that these east and west segments of the Poser vein unite above the 500 level, and, united on dip, extend to and unite or merge with some of said ore bodies and the veins including them; and that the Intermediate vein likewise extends to and includes a small ore body on the 2,800 level.

Defendant denies that the Poser vein exists west of the Emily vein, admits plaintiffs own the Pilot vein east of the Emily vein, contends that in the region west of the Emily plaintiffs have defined a course for the Poser vein through the country and along the Black Rock fault, and denies that the Intermediate vein extends to the small ore body aforesaid. As none of the ore bodies are in the Poser or Pilot vein east of the Emily vein, the case divides in two parts, viz.: (1) The existence of the Poser vein west of the Emily vein; and (2) the relation of the Intermediate vein to the small ore body on the 2,800 level.

[1, 2] Since the ore bodies are within defendant's vertical boundaries and veins apexing in its claims, they are prima facie its property, to it conveyed by United States patents. The burden to prove otherwise is upon plaintiffs—to prove if they can (1) that the Poser vein exists as such west of the Emily vein, is of Steward age, and unites or merges with the said ore bodies and veins including them; and (2) that the Intermediate vein includes the ore body on the 2,800 level. This burden upon plaintiffs is by no means a light one, for "the proof in effect * * * seeking to withdraw or except from a solemn grant, over the seal of the United States, premises prima facie conveyed by it, must be clear and convincing, in quality and quantity that inspires confidence and produces conviction." See Clark-Montana Realty Co. v. Ferguson (D. C.) 218 F. 963.

[3] And plaintiffs can recover only on the strength of their own theory, case, and title, and not at all upon any weakness, if any, in defendant's. Their case may fail of its own inherent weakness, by the testimony of its own witnesses, as well as by evidence presented by defendant. If, upon consideration of all evidence, plaintiffs' contentions are no

more probable than defendant's, their case fails for want of proof, and decree must be against them.

[4] Plaintiffs' theory that the Poser vein is of Steward age is that upon which the suit has been tried. It is so far vital to their case that, if not proven, but little, if any, further consideration is due that part of it.

In further detail, it will be remembered that fault veins of Steward age are younger than veins of East-West and Northwest ages. It follows that, where the former and either of the latter cross, the vein of Steward age will intersect or cut through the other. In these premises are exposed many crossings between the Poser vein and veins of East-West and Northwest ages. Plaintiffs' experts testify to the inference, opinion, or conclusion that the Poser vein intersects the Emily vein, and defendant's experts that the Emily vein intersects the region plaintiffs assign to the Poser vein.

But, when it comes to facts, the testimony of plaintiffs' experts, to considerable extent, coincides with that of defendant's experts, and demonstrates that the Poser vein is intersected by veins of both East-West and Northwest ages, and that their inferences, opinions, and conclusions to the contrary are not only valueless, but also are reckless evasions. It would seem that they count too much upon credulity and lack of discernment in the court. To illustrate: Burch testifies that on the 500 level "we find the *Poser also on both sides of the Northwest vein,* but a very light crack crossing the Emily vein, very light indeed." The Northwest vein is identified as the Emily vein. Simkins testifies that on this level the Poser vein is wider than the drift in which it is located and which is crossed by the Emily vein, and that only a "wall" cuts through the Emily, "possibly about one-half inch" of gouge. Lawson testifies that this gouge is less than one inch; that there the Poser vein is many feet wide, and is *on both sides of the Emily vein* there crossing.

Lawson further testifies that on the 700 level, at crossing, the Emily vein *penetrates* the Poser vein some 5 feet and until cut and presumably faulted by a northeast fault, and that on the 1,300 level, where the Poser vein and a vein identified as of East-West age cross, the latter *penetrates* the Poser vein for some 20 feet and until cut and faulted by the Black Rock fault. And Burch, Mead, and Simkins testify that on this 1,300 level the *Emily vein proceeds unbroken through the Poser vein,* there some 60 feet wide. Plaintiffs' exhibits disclose this fact, though on the

map, but not on the model, the red-colored Poser vein has been superimposed on the yellow colored Emily vein. And in lower levels certain veins of East-West age, by plaintiffs formerly claimed to be the Poser vein, and yet claimed in part, are intersected by veins of Northwest age.

In the face of these facts, plaintiffs' theory that the Poser vein is of Steward age clearly fails of proof. Intersection affords an infallible test of age, and the Poser vein failed when subjected to it. Hence it is unnecessary to consider other evidence by plaintiffs assumed to sustain their theory. And it is to be noted that failure of the theory deprives all argument and inference, based upon it, of weight or title to consideration or comment.

In their reply brief, however, plaintiffs tentatively suggest that a vein of any age and structure will serve their purpose, and that perhaps the Poser vein is of some age and form heretofore unknown. If it be granted that this belated change of theory and position is open to plaintiffs, what is their case? It is admitted that the Poser is not of the known East-West and Northwest ages, in part is not of that true fissure type which characterizes the Butte district, and 50 years' study and experience of and in the Butte district leave little possibility of veins of new structure and unknown ages. Then too, possibilities have little, if any, evidentiary value.

Passing that, however, the testimony of plaintiffs' experts is that the Poser vein, for 200 to 400 feet west of the Emily vein, and from the 1,300 level upward, is not a fissure, but altered granite, permeated with northwest oblique or transverse mineralized seams of westerly trend, a criss-cross or network structure without dip, strike, or definite walls; that in the country more or less undeveloped, and at varying distances, the walls will be found where the Poser vein fades into fresh granite. With this fact description, the testimony of defendant's experts more or less agrees; but they also testify that the granite is little altered, that the northwest transverse structure is not so extensive and is to be associated with the Emily vein, and that the whole is not a vein in this district peculiarly of true fissure veins.

Here again the opinions of plaintiffs' experts must yield to their facts. This northwest oblique, transverse, criss-cross, and network structure is nothing but the conjugated fracturing and stock work of the Elm Orlu Case, christened with new names. Statesmen long since discovered that new names may revive the vogue of time-worn and discarded

political theories. The like strategy must fail in judicial administration, however.

The plaintiffs in the Elm Orlu Case are two of those in the case at bar. There it was to their interest to contend, as they did, that stockwork or network is not a vein. The court agreed with them; the law agreed with them. Here it is to their interest to about face and contend, as they do, that it is a vein. In that the court cannot follow them. Litigants may change opinions as their interests change, but courts, law, and principles of justice have other standards of stability than the kaleidoscopic attitudes and positions of interested parties.

In so far as plaintiffs rely upon sample assays disclosing in this network structure some noncommercial values of silver, copper, and zinc, the values are immaterial. Even if of commercial value, the structure would be at most a deposit of ore perhaps adjacent to the Emily vein but not itself a vein, again adhering to the doctrine of the Elm Orlu Case.

West of this network, the Poser vein, as defined by plaintiffs, extends some 400 to 600 feet. Their experts describe it as along the Black Rock fault, from 6 inches to 12 feet wide, composed of gouge and crushed granite altered and mineralized, and in some places of banded sulphide ore. In their opinion it is the Poser vein, prior in time to the Black Rock fault. Defendant's experts testify that the whole is the Black Rock fault and of its typical content, save some few segments of veins by the fault cut, displaced, and associated, and that it is not a vein.

In support of their contention, plaintiffs present thousands of sample assays from the Poser vein and from other veins for purposes of comparison. They range from nothing, or traces, to five ounces of silver, and/or 5 per cent. of copper and/or zinc, or both. Averages computed by plaintiffs are as follows: All levels from the 167 to the 1,300, both inclusive, silver, 0.71 oz.; copper, 0.24 per cent.; zinc, 1.15 per cent. All raises from the 1,000 level to the surface, silver, 1.54 oz.; copper, 0.15 per cent.; zinc, 1.36 per cent.; lead, 0.39 per cent. They compare favorably with those presented by plaintiffs from various veins. From this latter circumstance, plaintiffs argue the Poser must also be a vein. These assays are very irregular, abruptly ascending from lowest to highest, and as abruptly descending. Defendant criticizes the method of sampling with some justification. On the whole, they are not impressive, and can have little weight in the determination whether the Poser is a vein for the 400 to 600 feet west of the network structure

aforesaid. To this end, a brief narrative of events may be enlightening.

Prior to 1923, the Poser claim had been little developed, and plaintiffs assert that the workings disclosed all veins dipped northerly. To the 1,000 level, various cross-cuts had intersected the territory by plaintiffs now assigned to the Poser vein, but whether recognized as a vein does not appear.

In 1906, defendant commenced to sink the Badger shaft, 850 feet south of the Poser claim and 400 feet west of the latter's east end line plane extended. Through it the ore bodies in dispute were developed. Along a considerable part of the north side or end of these ore bodies is the Black Rock fault, and it is in the nature of a foot wall for them. This fault is postmineral, contains no ore, is not mined, and between veins of northwesterly strike, the ore bodies of which abut against the fault, connecting drifts were not run.

In 1913, plaintiffs secured license to inspect defendant's development aforesaid, and from time to time exercised the privilege, though they then had no knowledge that in the Poser claim was any vein of southerly dip.

In 1923, plaintiffs first discovered that the Poser vein dipped southerly. Thereupon they inaugurated what in their evidence and briefs is strikingly characterized as a "campaign of development," a "mode of attack," and a "method of approach." Their somewhat novel strategy was not to develop an apex within the Poser claim, and follow ore or vein downward, whence it would lead, but was to secure further license to enter defendant's workings and the ore bodies, from thence to raise or work upward in endeavor to trace connections to somewhere in the Poser claim. Their line of raises from ore bodies in East-West veins, near the Poser east end line plane extended, failed to connect and was abandoned. Their midline of raises started in and along the Black Rock fault, where in the nature of a foot wall for the ore bodies as aforesaid, and upon and along the fault was carried to the 1,000 level, and on the Poser or Pilot vein east of the Emily to the 700 level. Their west line of raises at the Poser west end line plane extended, started on the 2,000 level on the State and North Badger veins some distance west of the ore bodies in them contained. These raises converged to union below the 1,600 level, and thence the single raise was carried to the surface of the Poser claim. In the raise which started on the State vein is also the Black Rock fault, and in the raise above the union aforesaid is the said fault to the surface. In

respect to this latter, the evidence is without real conflict.

Upon the 700, 1,000, and 1,300 levels are drifts or cross-cuts along or intersecting the Poser vein as defined by plaintiffs. Throughout all of them, and coincident with the Poser vein, is the Black Rock fault, save where its curvature departs from the course of the Poser, and there the Poser vein is no longer a fissure, but is the network structure before described.

It is plaintiffs' contention that, throughout the west raises and the workings upon the levels aforesaid, the Poser vein is found, and it is defendant's contention that the west raise departs from the united State and North Badger veins below the 1,300 level; that from thence to the surface is nothing but the Black Rock fault, save segments of the North State vein by the fault encountered, cut, and displaced; and that in the 1,300 level, and those above, the like condition prevails. The State and North Badger veins are of East-West age, and plaintiffs offer no explanation when, where, and how they were transformed to the Poser vein of Steward age. Yet these are the veins they contend united and were followed by the west raise to the surface. In said raise, between the 1,300 and 700 levels, the Black Rock fault cuts through the Poser vein. Although its normal "throw" is downward 160 feet or more on the hanging wall, it has thrown the Poser vein none at all.

For this abnormality, plaintiffs suggest compensating faults in the undeveloped country and unknown. In various of these workings and at the surface, as elsewhere, was view of the premises by the trial judge.

In consideration of conflicting opinions anent this 400 to 600 feet, plaintiffs argue that they permanently employ fewer of their experts than does defendant. That seems of little moment. All these experts have compensation to earn, trust to vindicate, opinions and theories to defend, success to win, repute, prestige, and fame to achieve, whether as employee, expert, instructor, author, or what not, now or in the future.

Long absorbed in the problems of this controversy, all see, believe, adjudge as do their employers; all are committed to the latters' causes, and are zealous to further them; all are more or less partisan. Otherwise they would not be presented as witnesses. None the less, all are of learning and experience, and doubtless all believe that in the main their representations of fact and opinion conform to the truth—or hope the court will believe they do. As a whole their testimony merits and receives careful consideration.

It is noted, however, that in acquaintance with, experience in, and knowledge of the district defendant's experts are greatly superior, and it must be said that in disposition and skill to fence and evade they are inferior. In respect to the last virtue, Burch and Simkins may take place with defendant's experts. Moreover, view of the premises tends to sustain defendant's experts in conflicts between them and the experts of plaintiffs, save in some comparatively unimportant instances. So it is, that the evidence fails to prove that the 400 to 600 feet aforesaid constitute the Poser vein.

Rather does it prove that, save where the State and North Badger veins were raised upon, and save where segments of the North State vein are included, plaintiffs' workings disclose nothing but the Black Rock fault.

Past history, the method of development, the presence of the fault, the absence of a fissure without the fault, the content and structure, the absence of any "throw" of the Poser vein where cut by the fault having normal throw of 160 feet, the failure of plaintiffs' theory of Steward age for the Poser vein, the striking differences between the Poser west of the Emily, and the Poser or Pilot east of the Emily, the reckless opinions of plaintiffs' experts as aforesaid, the reasonable consistency attaching to the opinions of defendant's experts, render unjustified any finding that the Poser vein exists in this 400 to 600 feet or at all west of the Emily vein, and require the finding that in said 400 to 600 feet is naught but the Black Rock fault.

In view of this conclusion in respect to the first part of the case, it is unnecessary to here consider (1) whether a vein of one age can unite or merge with a vein of another age, or only intersect, adjoin, or abut it; and (2) whether, in any case, a fissure no better mineralized than plaintiffs' sample assays indicate for 1,300 feet is a "continuous vein," in legal contemplation or in fact, affording an apex and extralateral rights to great ore bodies below. The last may well be doubted.

[5] Coming to the second part of the case, involving the small ore body on the 2,800 level, and the Intermediate vein, it appears that the strike of the ore body, where its southeasterly end is intersected by the Poser claim's east end line extended 650 feet southeasterly, is less than 45° from said plane. For that reason, plaintiffs' asserted right is to follow on strike rather than on dip; the only evidence of the apex being a presumption of like strike. See Stewart Mining Co.

v. Ontario Mining Co., 23 Idaho, 724, 132 P. 787, affirmed on other grounds in 237 U. S. 358, 35 S. Ct. 610, 59 L. Ed. 989.

But, pretermitting the point as have the parties, and adverting to the evidence, said ore body is between those of two roughly parallel veins of Northwest age, 100 to 200 feet distant. From this ore body also, plaintiffs raised rather than from an apex to descend; and not in a single plane, but by offset raises. The reason advanced here, as in some place elsewhere, is that other veins might have presented difficulties in following through. In such circumstances a vein cannot be projected through. If parties lack confidence in the essential continuity of the vein, discredit the presumption of continuity, there is no reason why the court should have more confidence, and indulge the presumption.

Raising from the ore body to the 2,600 level, plaintiffs arrived at intimate association between the vein of southerly dip which they were following and the Mill vein of northerly dip, so that whether they unite or intersect is doubtful. On this 2,600 level, plaintiffs drifted 350 feet northwesterly, raised to the 1,700 level, drifted 150 feet southeasterly, and through 1,736 raise attained the 1,500 level. It is admitted that in this raise is a vein which continues to and includes the ore body on the 2,800 level; and, aside from the question of apex, the controversy is narrowed to whether this vein in 1,736 raise is the Intermediate vein. The issue is farther narrowed to whether this vein does not unite with the Emily vein, with which it converges at an acute angle some 10 feet from the raise. As the Intermediate vein is of East-West age and the Emily vein is of Northwest age, it is virtually admitted and obvious they will not unite, and that, if the vein in 1,736 raise and the Emily vein do unite, the vein in the raise is a branch of the Emily vein, and is not the Intermediate vein. And it is equally obvious that, if the vein in 1,736 raise is not proven to not unite with the Emily vein, where in close relation suggesting union, the evidence fails to prove it is the Intermediate vein. In other words, if identity is otherwise doubtful, plaintiffs have the burden of negativing union.

The situation at this point is so far critical that both parties prosecuted development throughout the trial. In brief description, from 1,736 raise 1,550 drift extends 450 feet northwesterly to 1,550 raise, and also extends perhaps 15 feet easterly and curving to southeasterly. On its westerly course, 1,550 drift crosses 1,583 cross-cut some 175 feet from

1,736 raise, and crosses 1,551 cross-cut some 50 feet farther. The Intermediate vein in 1,550 drift from 1,550 raise to 1,551 cross-cut is a strong vein of quartz ore, six to eight feet wide. At 1,583 cross-cut, the Intermediate vein, reduced in size, in larger part, if not all, departs northeasterly from 1,550 drift. From this point to 1,736 raise is a region of small seams, faults, veins, and branches, wherein identity and correlation is not easy. Nevertheless the parties agree that from at or near 1,583 cross-cut is a small vein of 6 to 12 inches in width, which coursing southeasterly in 1,550 drift, divides in two branches, unites, and redivides, the southern branch entering 1,736 raise and being the vein in which is the ore body on the 2,800 level, and the northern branch continuing in 1,550 drift as it curves from north to southeast around 1,736 raise. There it converges to the Emily vein, the two forming an acute angle.

Plaintiffs contend these two branches are the Intermediate vein and that the northern branch does not unite with the Emily vein. Defendant denies, and contends that the branches are branches of the Emily vein, and that the northern branch unites with the Emily where they converge as aforesaid. Or in other words, the Emily branches, one branch coursing northwesterly and is the small vein in 1,550 drift to 1,583 cross-cut as aforesaid. The second part of the case is resolved right here. Again, the experts are not at much difference in respect to facts, but are hopelessly so in opinions. For plaintiffs, Burch and Roddewig testify that they "think" the northern branch and the Emily are "very closely in contact," but they "see no evidence" of union—"have been unable to find any evidence of a union whatever."

Plaintiffs' expert Simkins, when asked on cross-examination, if the quartz of the northern branch did "not disappear and go right into the Emily vein, and that it can be seen as one vein for a distance of 15 or 20 feet," answered, "I don't think that is quite true," but that the mineralization in the northern branch forms contact with the Emily vein, quartz with quartz, and no gouge or anything between them, and that, proceeding southeasterly, the foot wall of the northern branch is also the foot wall of the Emily vein. And he volunteered, "But I don't know whether this is a junction or not."

For defendant, Sales testifies that the new work, which includes the curve of 1,550 drift around 1,736 raise to the Emily vein, discloses that the vein in 1,736 raise "unites and turns up with the Emily in the 1,500 level

workings." Other new work includes what may be characterized as an upright square of raises and drifts, of which 1,736 raise is the west side, wherein defendant's experts testify is a single vein (the southern branch in 1,736 raise) and that it unites with the Emily.

Plaintiffs' experts testify that in this square of workings are two veins, the one in 1,736 raise, and one of Northwest age. Barker testifies that, where the northern branch and the Emily converge, they are visible as one vein in the "back" for 7 or 8 feet—"a perfect union there. I couldn't tell the quartz of the vein coming down from 1,550 drift from the quartz along the Emily; * * * couldn't distinguish them"; that the northern branch is "6 to 8 inches of quartz, iron, copper, and gouge," and "where it joins with the Emily there is about 20 inches of quartz, manganese, and zinc" in both; and that he "saw union of quartz there." Steele testifies that there is a "union of two veins," the northern branch and the Emily, that the union is visible in "the back" for 5 or 6 feet, and that the veins "touched and became one vein beyond there, * * * just like two streams flowing into each other unite." The view of the premises included all these workings.

Plaintiffs' evidence fails to prove that the vein in 1,736 raise is not a branch of the Emily, does not unite with the Emily, or is the Intermediate vein. Simkins' testimony alone leaves it doubtful, and that of Burch and Roddewig does little to lessen the doubt. The view of the premises persuades that defendant's experts are to be credited in their testimony that the northern branch and the Emily unite, and that Steele's comparison to streams flowing together is an apt and forceful simile.

The northern branch and the Emily unite, the former a branch of the latter. It follows that the northern branch is of Northwest age, as the Emily is; that the southern branch, which is admitted to unite with the northern branch, is also of Northwest age; that the southern branch in 1,736 raise is not the Intermediate vein of East-West age; and that the ore body in 2,800 level is not in the Intermediate vein, but is in a branch of the Emily vein.

Plaintiffs refer to the sometime appearance of union of veins, when in fact one intersects the other, and recementation by mineralizing solutions conceals the evidences, as of reference in the Elm Orlu Case. There was involved the great Rainbow vein and its intense mineralization, none of which is present here. And plaintiffs have not claimed an intersection here, but rather a curious "curl" by the alleged and older Intermediate vein, down and along the younger Emily vein, a "curl" without apparent cause.

Plaintiffs' comparison with the Pyle strand of the Rainbow vein fails. The latter is the chord of an arc of a circle of the Rainbow vein, and at no place is farther than 100 feet from the Rainbow. The Intermediate vein, if where plaintiffs allege it is at the ore body on the 2,800 level, is 800 feet from the Rainbow and on a tangent, never to return to the Rainbow. Neither in the Elm Orlu Case nor in this is there any evidence that branches of the Rainbow resemble this phenomenon imputed to the Intermediate vein.

And finally, to conclude that all the Intermediate vein departs northeasterly from 1,550 drift at 1,583 cross-cut better conforms to the Intermediate on the 1,300 level. There, cut by the Emily, and faulted 100 feet to the north and left, the eastern segment proceeds northeasterly, as appears by the course of the drift plaintiffs ran to follow it, and by the notes and testimony of defendant's experts, plaintiffs' experts to the contrary notwithstanding.

In view of the clarity of the evidence that the vein in 1,736 raise unites with the Emily vein, other workings and phenomena require no comment or consideration. Without more, the conclusion is that plaintiffs are not entitled to recover, and decree is rendered for defendant.